[Cite as *State v. Mundt*, 2016-Ohio-4802.]

STATE OF OHIO, NOBLE COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | CASE NO. 13 NO 0406 |
| VS. | ) | |
| | ) | OPINION |
| FREDERICK MUNDT | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Court of Common
                               Pleas of Noble County, Ohio
                               Case No. 204-2002

JUDGMENT:                      Affirmed.

APPEARANCES:
For Plaintiff-Appellee         Attorney Kelly Riddle
                               406 North Street
                               Caldwell, Ohio 43724

For Defendant-Appellant        Attorney Tyson Fleming
                               Assistant Public Defender
                               250 East Broad Street, Suite 1400
                               Columbus, Ohio 43215

JUDGES:

Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Carol Ann Robb

Dated: June 30, 2016

DeGENARO, J.

**{¶1}** Defendant-Appellant, Frederick Mundt, appeals the judgment of the Noble County Court of Common Pleas denying his petition for post-conviction relief on the basis of res judicata. Mundt's assignments of error are meritless and the judgment of the trial court is affirmed.

## Facts and Procedural History

**{¶2}** Mundt's direct appeal of his convictions and death sentence were appealed to the Ohio Supreme Court as of right. *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828 (*Mundt I*). The facts and procedure are as follows:

On March 9, 2004, seven-year-old Brittany Hendrickson disappeared from her home in Noble County. The next day, searchers found Brittany's raped, battered body hidden in a nearby abandoned well. Appellant, Frederick A. Mundt, was convicted of the aggravated murder of Brittany and sentenced to death.

The evidence at Mundt's trial revealed that Brittany's mother, Misty Hendrickson, became acquainted with Mundt in 1999. She and her daughters, Brittany and Lindsay, soon moved into Mundt's house in Lower Salem, Noble County. In 2004, Mundt and Hendrickson lived there with Brittany and Lindsay, and their infant son, Shay Mundt. Mundt's mother, Sarah Mundt, lived nearby with her boyfriend Tim Bowman and their adult daughters, Mundt's half-sisters, Timica, Teresa, and Mary Anne Bowman.

During the late morning or early afternoon of March 9, 2004, Mundt visited the Biolife Plasma Services Plasma Center in Parkersburg, West Virginia to sell his blood plasma.

March 9, 2004, was a school day for Brittany Hendrickson. The school bus brought her home that day around 4:10 p.m., and her bus driver saw her go inside the house.

Five or ten minutes later, Mundt's stepfather, Tim Bowman, arrived. Bowman and Sarah, along with their daughter Mary Anne and her date, had plans to play bingo that night in Woodsfield, Ohio. Bowman came to invite Hendrickson to join them. After checking with Mundt, Hendrickson accepted. Bowman was at Mundt's house for five to ten minutes; during that time, he saw Brittany and Lindsay at play.

Hendrickson fed her daughters about 4:45 p.m. Half an hour later, Bowman arrived at Mundt's house to pick Hendrickson up.

Hendrickson said goodbye and "told the kids to go upstairs with their dad [Mundt] when they [were] done eating." Although Bowman did not enter the house, he recalled hearing Hendrickson telling the girls to eat dinner and go upstairs.

Around 8:00 p.m., Mundt arrived at the Bowman residence with Lindsay and Shay. Timica and Teresa Bowman were present. Mundt asked Timica if Brittany was there and said, "[S]he ain't up home, and I have to find her." Leaving the children with Teresa, Mundt and Timica drove to Woodsfield.

They arrived at the bingo hall around 8:30 p.m. Mundt approached Hendrickson and asked if Brittany was with her. Hendrickson replied, "No, I left her there with you." She got up, grabbed her coat, and left with Mundt and Timica. The three then drove back to Mundt's house. At 9:18 p.m., Hendrickson called the Monroe County Sheriff's Office to report Brittany missing. Officers immediately began to search for Brittany, a search that lasted into the next day.

On March 10, a civilian volunteer taking part in the search noticed a sheet of tin covering the opening of an old well on property near

Mundt's house. Moving the tin revealed a chunk of concrete wedged into the opening of the well. The surface of the well water was visible around the sides of the concrete chunk. The volunteer looked into the well and saw a pair of green shoes floating amid some debris. The volunteer reported his find and led sheriff's deputies to the well.

The deputies recovered one of the shoes and brought it to Hendrickson, who identified it as Brittany's. Other officers removed the chunk of concrete and recovered Brittany's body from the well.

Shortly after the officers recovered her body, Agents Gary Wilgus and William Hatfield of the Bureau of Criminal Identification and Investigation ("BCI") arrived at the crime scene. Wilgus noted numerous abrasions and contusions on Brittany's head. Her jeans were undone, and the leg bottoms partly covered her feet.

Hatfield found bloodstains and hairs on the chunk of concrete from the well. Hatfield later weighed and measured the chunk; it was 36 inches long and 14 inches wide at its widest point and weighed 254 pounds.

According to Hendrickson, Mundt stated on the morning of March 10 that "they will probably pin this on him * * * because he was supposed to be the last one to see her."

Detective Sergeant Mark Warden and Lieutenant Seevers of the Washington County Sheriff's Office interviewed Mundt after Brittany's body was found. Mundt asked whether a condemned prisoner could "choose between lethal injection and the gas chamber." Warden then informed Mundt that Brittany's body had been found and that Warden "felt he was responsible for [her] death." Mundt denied it.

Warden noted that Mundt's forearms were scratched. Mundt claimed

that the family dog had knocked him down some steps while he was looking for Brittany. When Warden expressed disbelief, Mundt merely hung his head. Biolife Plasma Services personnel later testified that Mundt did not have those scratches on his arm when he sold plasma on the morning of March 9.

Seevers asked Mundt whether Brittany could have been sexually assaulted. Mundt first said no, then asked, "Well, how would I know?" The officers then took a DNA swab and collected other trace evidence from Mundt's person. As Warden was cataloguing these items, Mundt asked: "Do you think I should die?" Warden replied, "Well, do you think you should be put to death?" Mundt said, "Yes."

Dr. P.S.S. Sreenivasa Murthy, a pathologist and deputy coroner for Stark and Wayne Counties, conducted an autopsy on Brittany, assisted by Dr. Anthony Bertin, a urologist, who examined Brittany's genitalia.

Dr. Murthy found that Brittany had extensive blunt-force head injuries. These included multiple lacerations and bruises, a skull fracture, and hemorrhaging and contusions of the brain. She also had blunt-force injuries to her trunk and extremities.

Brittany's lungs were hyperinflated and contained excess fluid, leading Dr. Murthy to conclude that she had drowned in the well. But because Brittany was 47 inches tall while the water in the well was only 30 to 36 inches deep, Murthy concluded that Brittany's injuries had left her unable to stand up. Murthy also concluded that given the severity of her injuries, Brittany would have died within 10 to 15 minutes. Thus, Murthy concluded that she died both of drowning and of her multiple blunt-force injuries.

Dr. Bertin, the urologist, observed that Brittany's panties were soaked with blood. Her vaginal opening was "imploded," as if a large object had been forced into it. Her vaginal walls had been "ripped apart," with deep, full-length lacerations on both sides. In Dr. Bertin's opinion, a rigid object, approximately two and one-half inches in diameter, had been forced up Brittany's vaginal canal with "considerable force."

Diane Larson, a BCI forensic scientist, examined numerous evidentiary items. Those yielding significant DNA evidence included vaginal swabs taken during Brittany's autopsy, fabric cut from the crotch of Brittany's panties, a bloodstained bedsheet found on the bed in Mundt's master bedroom, and a bloodstained shirt found in Mundt's bathroom and identified as his.

Larson found sperm cells on the vaginal swabs and on Brittany's panties. She identified a mixture of two DNA profiles on the sperm fraction of the vaginal swabs. One of the mixed profiles was consistent with Mundt; the other was consistent with Brittany. The proportion of the population that could not be excluded as a possible contributor to that mixture was one in 203,800.

On the panties, Larson identified "two clean separate DNA profiles." The major profile, or largest amount, came from sperm and was consistent with Mundt's DNA. The expected frequency of the major profile was one in approximately 39 quadrillion, 350 trillion persons. The minor profile was consistent with Brittany's DNA.

On the bedsheet, DNA testing showed a mixture of two DNA profiles. The major profile was consistent with Mundt's DNA; the minor profile was consistent with Brittany's. The expected frequency of the minor profile was one in 146 million persons.

Mark Losko, another forensic scientist at BCI, testified that testing on Mundt's shirt revealed a mixture of two DNA profiles. The major profile was consistent with Brittany's DNA. The expected frequency of that profile was one in 4.7 quadrillion persons. The minor profile was consistent with Mundt's DNA.

After Mundt's arrest, his half-brother, Johnny Mundt, visited him in jail. Johnny testified that he asked Mundt "if he done it." Mundt admitted that he had raped Brittany. Then he asked Johnny "if I can get the stuff out of the house." Mundt told Johnny that "the stuff" was behind the stereo. Johnny agreed to remove it.

On April 24 and 25, 2004, while Mundt was incarcerated in the county jail, he had several telephone conversations with Johnny. In these conversations, Mundt repeatedly urged Johnny to remove and destroy certain "stuff" or "trash" located in the wall behind the stereo in Mundt's house. The sheriff's office recorded these conversations, and the state introduced them at trial.

These recordings convey Mundt's sense of urgency and concern for secrecy because he continually expressed his anxiety about when Johnny was going to burn the "trash" and whether he had burned "all of it." He warned Johnny that their conversation was being taped and reminded him several times not to let their mother see him burning the "trash."

On April 24, Mundt asked Johnny: "Hey, did you get all that stuff out of there where the radio is? * * * Would you be able to get that out?"

Mundt continued:

"You going to burn that stuff? * * * Well, make sure Mom ain't down

there when you get burning that. * * * I really—really hope you can do that for me."

"You, uh, sure you can get that stuff out of there? * * * I'm really a-hoping. * * * 'Cause I'm really wanting that stuff out of there. You hear? * * * Make sure you get it all."

"Yeah, I hope you do that, take—take that trash out. Out—out back of the stereo. I really need to get that out of the house. You hear? * * * Back behind the stereo, yeah. Where the wall's at? * * * Down in there. * * * You going to burn all that? * * * That would do me a lot of good."

On the following day, Mundt talked to Johnny three more times. In the first of these conversations, Mundt asked: "Did you get all that trash burnt?" Mundt explained that the "trash" was hidden in the wall to the left of the stereo "where the insulation [was] moved," approximately two feet away from the drywall. He instructed Johnny to "find all that trash" and "get rid of that for me and burn it. * * * Don't have Ma and them up there." He also warned Johnny that "[t]his telephone's taped."

In their second conversation on April 25, Mundt pressed Johnny: "Did you get it? * * * Did you get all of it? * * * Make sure you burn all that trash. * * * Mom and them can't see that."

In his third April 25 conversation with Johnny, Mundt again asked: "Did you make sure that other trash is burnt?" He told Johnny to "make sure that burns up nice and good. * * * Make sure there ain't nothing left of it. * * * 'Cause they be up there looking through that next." Johnny said, "They're done up there, they ain't gonna go back up there." Mundt replied, "Don't bet on it."

According to Johnny, he eventually found "a little hole" in the corner of

a room in Mundt's house. In that hole, Johnny found a pair of boxer shorts, a T-shirt, a pair of girl's socks, and a pillowcase, each spattered with blood. Johnny put these items into a box and hid the box in another part of the house. The next day, he took the box home and burned it with the bloodstained items inside.

On April 26, Mundt talked to Sarah Mundt from jail. The sheriff's office recorded this conversation. Sarah mentioned that Johnny had been burning things the night before, including a box. Mundt had his mother describe the box, then asked: "He burn it?" Mundt pressed Sarah for details: "Did you go up with him last night? * * * Did he pour gas on all that trash? * * * Did it burn?"

On May 3, 2004, police searched Mundt's house again. In a second-floor room, between a floor joist and the exterior wall, they found the space where Mundt had hidden the bloodstained items.

Police cut out a section of the floor joist from the hiding place. The joist tested positive for blood. Mark Losko, the BCI forensic scientist, found a mixture of two DNA profiles on the joist. The major contributor's DNA profile was consistent with Brittany's and would be found in one of 4.7 quadrillion persons. The minor contributor's DNA profile was consistent with Mundt's and would be found in one of 139 persons.

On June 19, Mundt had yet another phone conversation with his mother from jail, and this too was recorded by the sheriff's office. Mundt urged his mother to remove his weights from his house: "You need to get those weights out of there. * * * They'll use that against me. * * * They'll try to say that I lifted those things down there. * * * Well, at least take some of the weights off the weight bench. * * * Did you take any weights off it?"

At trial, the jury found Mundt guilty of four counts of aggravated murder, each with four death specifications; two counts of rape, R.C. 2907.02(A)(1)(b) and (A)(2); and one count of kidnapping.

Before the penalty phase, the trial court merged the four aggravated-murder counts into a single count of aggravated murder under R.C. 2903.01(C) (murder of a child under 13) and merged the four specifications into two: murder to escape detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3), and murder committed during a kidnapping, R.C. 2929.04(A)(7).

The jury recommended that Mundt be sentenced to death for his aggravated-murder conviction. The trial judge sentenced Mundt to death.

*Id.* at ¶ 2 - ¶ 45.

**{¶3}** On direct appeal Mundt presented 11 propositions of law, all of which were found meritless by the Ohio Supreme Court. *Id.* at ¶ 46. Additionally, the Court independently reviewed Mundt's death sentence and found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. *Id.* After conducting a proportionality review, the Court concluded the death sentence was proportionate with others they reviewed; Mundt's convictions and death sentence were affirmed. *Id.*

**{¶4}** Mundt filed a post-conviction petition pursuant to R.C. 2953.21 and proceeded to a two day hearing. The trial court dismissed Mundt's petition, reasoning that his claims were barred by res judicata, either because the claims had been addressed on direct appeal or could have been raised in a direct appeal. The trial court reasoned that res judicata precluded the claims because the factual basis for resolving them could be found in the original trial record and not dependent upon evidence dehors the record. The trial court alternatively did address the merits of

Mundt's third claim relative to trial counsel's ineffectiveness for failing to order MRI/PET scans for the mitigation phase and rejected it. Finally, the trial court deemed two of Mundt's claims, nine and ten, appropriate for post-conviction consideration; the failure to call his mother and half-sister during the mitigation phase, which were rejected on the merits.

### Res Judicata

{¶5} As both assignments of error address the dismissal of his post-conviction petition, they will be discussed together for clarity of analysis. In his two assignments of error, Mundt asserts:

The trial court erred by applying the doctrine of res judicata to bar Mundt's grounds for relief.

The trial court erred in dismissing Mundt's post-conviction when he presented sufficient operative facts to merit relief.

{¶6} On appeal Mundt asserts that his post-conviction petition was supported by factual allegations that could not be determined by an examination of the files and record of this case. R.C. 2953.21 and R.C. 2953.23 govern petitions for postconviction relief. Under R.C. 2953.21, relief from a judgment or sentence is available for a person convicted of a criminal offense who shows that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States[.]"

{¶7} "A trial court may dismiss a postconviction petition on the basis of the doctrine of res judicata*." State v. Dillingham,* 12th Dist. Nos. CA2012–02–and CA2012–02–042, 2012–Ohio–5841, ¶ 9. "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at trial, which resulted in that judgment of conviction, or on

an appeal from that judgment." *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), syllabus.

**{¶8}** An exception to the res judicata bar exists when the petitioner presents competent, relevant, and material evidence outside the record that was not in existence and available to the petitioner in time to support the direct appeal. *State v. Bayless,* 12th Dist. Nos. CA2013–10–020 and CA2013–10–021, 2014-Ohio-2475, ¶ 10. For a defendant to avoid dismissal of the petition by operation of res judicata, the evidence supporting the claims in the petition must be competent, relevant, and material evidence outside the trial court record, and it must not be evidence that existed or was available for use at the time of trial. *State v. Cole*, 2 Ohio St.3d 112, 113, 443 N.E.2d 169 (1982).

**{¶9}** This Court reviews questions of law de novo. *Cuyahoga Cty. Bd. of Commrs. v. State,* 112 Ohio St.3d 59, 2006–Ohio–6499, 858 N.E.2d 330, ¶ 23.

**{¶10}** A review of Mundt's petition reveals that virtually all of the claims raised are barred by res judicata, either because they were raised and resolved in his direct appeal or could have been raised. We will address each res judicata argument in turn.

### Claims Raised and Resolved on Direct Appeal

**{¶11}** As noted by the trial court, the following six claims asserted in Mundt's post-conviction petition were raised by Mundt in his direct appeal to the Supreme Court of Ohio and expressly rejected on the merits. Regarding claim one, ineffective assistance of counsel during the penalty phase, Mundt argued this exact point on direct appeal; that counsel's presentation was confusing, contradictory and prejudicial. *Mundt* I at ¶120-132. It was expressly rejected by the Court, reasoning: "Due to the nature of Mundt's crime, counsel could have rationally decided to offer the jury a variety of reasons to vote for life, hoping that at least one juror would accept at least one of those reasons." *Id.* at ¶ 143.

**{¶12}** Regarding claim two, ineffective assistance of counsel to seek and obtain expert assistance in determining the validity of the State's DNA Evidence,

Mundt's identical claim was summarily rejected on direct appeal. "Counsel's decision to rely on cross-examination instead of calling an expert witness does not constitute ineffective assistance." *Mundt* I at ¶118.

**{¶13}** Regarding claim four, ineffective assistance of counsel during the penalty phase involving the testimony of Dr. Sandra McPherson, although Mundt specifically argued on direct appeal that this testimony damaged his case, *Mundt* I at ¶120-123, the Court was unpersuaded. "Defense counsel cannot be criticized for their presentation of testimony from Heiden and McPherson during the penalty phase of the trial and their conduct in doing so does not violate *Strickland*." *Id.* at ¶135.

**{¶14}** Regarding claim six, ineffective assistance of counsel during the penalty phase in the testimony of Jeffrey Stevens, Mundt's argument on direct appeal that this proposed witness should have been called to testify was rejected by the Court as a strategic choice by counsel. *Id.* at ¶155-156. "Mundt's contention that being depicted as a struggling special-education student would have humanized him is rank speculation. Mundt's claim that the jury would have found this evidence compelling is equally speculative." *Id.* at ¶159. In a similar fashion, claim eight, ineffective assistance of counsel during the penalty phase regarding the testimony of proposed witness, Robert Willis, was rejected. *Id.* at ¶155-163.

**{¶15}** Lastly, regarding claim seven, ineffective assistance of counsel during voir dire specifically regarding juror Julie Watson and her inclination to "Automatically Vote for Death" Mundt asserted on direct appeal that Watson should have been excused given this articulated inclination. *Id.* at ¶49-61. The Court disagreed, finding no bias. "To the contrary, her responses indicated that she would be an open-minded juror." *Id.* at ¶76.

**{¶16}** The Supreme Court's rejection of Mundt's claims is the law of the case on those respective issues. The doctrine of law of the case "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984).

Accordingly, res judicata barred Mundt from reasserting claims one, two, four, six, seven and eight in his petition for post-conviction relief.

{¶17} Further, Mundt has failed to present competent, relevant and material evidence outside the record that was not in existence and available to him at the time of that direct appeal. None of the attached affidavits and documentation for any of the raised claims are competent evidence dehors the record. A petition for post-conviction relief does not provide a petitioner with a second opportunity to litigate his conviction. *State v. Rose*, 12th Dist. No. CA2012-03-050, 2012-Ohio-5957, ¶ 15-16.

**Claims Which Could Have Been Raised on Direct Appeal**

{¶18} Mundt is also barred from raising any defense or any claimed lack of due process that could have been raised at trial, which resulted in a conviction, or on an appeal from that judgment. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), syllabus. The following four claims were not raised in direct appeal and were presented by Mundt for the first time in the petition for post-conviction relief. We will address these claims slightly out of order for clarity of analysis.

{¶19} Regarding claim five—counsel ineffectively conducted voir dire to the extent that a change of venue was not granted—Mundt attempts to provide a different reasoning to achieve his desired end. He raised ineffective assistance of counsel during voir dire on direct appeal focusing on Juror Watson being inclined to automatically vote for death. Mundt now attacks how trial counsel questioned Watson, contending he should have conducted a "searching voir dire on her views." Though this is a slightly different argument than was addressed on direct appeal in *Mundt I,* it was a legal argument that was capable of being raised on direct appeal and nothing attached to the petition, or testified to at the evidentiary hearing is competent, relative and material evidence outside the record to add to what was in the record and reviewable during a direct appeal.

{¶20} We turn next to claims nine and ten, that counsel was ineffective for failing to use his mother, Sarah Mundt, more extensively during mitigation and to call his half-sister, Mary Anne Patterson, at all. Both affidavits attached to the petition and

their testimony at the evidentiary hearing confirm that Sarah did testify during the proceedings and Mary Ann was available to testify if she had been called. These claims are res judicata as Sarah and Mary Anne were known to defense counsel at the time of trial and available to testify. The use of their testimony either at all, or in a limited scope, is presumed to be trial strategy. As discussed above, a post-conviction petition is not a second opportunity to relitigate the trial or appeal. *Rose*, supra.

**{¶21}** Regarding claim three, that counsel was ineffective for failing to obtain the funds and order MRI and PET scans to use during mitigation, the trial judge found it to be barred by res judicata, but also denied it on the merits.

**{¶22}** To prevail on a claim of ineffective assistance of counsel, the defendant must show not only that counsel's performance was deficient, but also that he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶23}** The trial court is correct that this claim is res judicata and also fails on the merits. Mundt concedes that PET scan procedures had long been accepted at the time of his capital trial. More importantly, where a defendant, represented by different counsel on direct appeal, "fails to raise [in the direct appeal] the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is a proper basis for dismissing defendant's petition for postconviction relief." *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), syllabus. Mundt had different counsel for his direct appeal and the McPherson report was long in existence. As such this argument was capable of being made on direct appeal and is res judicata.

**{¶24}** We turn next to the trial court's denial of this claim on the merits. The basic premise of Mundt's claim is that his trial expert, Dr. McPherson had indicated in her report that organic brain damage needed to be ruled out, but trial counsel interpreted that to mean that Dr. McPherson had ruled out organic brain damage. As such he believes his trial counsel was ineffective for not following up on the McPherson recommendation.

**{¶25}** Dr. Richard Jackson was retained by Mundt's trial counsel for the mental retardation hearing, Marsha Heiden was hired as a mitigation specialist, and Dr. Sandra McPherson was retained as a clinical psychologist. These professionals gathered records from numerous sources and interviewed Mundt. McPherson administered several psychological tests on Mundt, and in her report the axis three diagnosis states "rule out organic damage impacting brain function."

**{¶26}** McPherson was not called to testify at the post-conviction petition hearing. As such, it is speculation to conclude exactly what she meant by the statement "rule out organic damage impacting brain function". In fact, trial counsel testified at the hearing that Mundt's post-conviction counsel would need to ask McPherson what "rule out means" as he believed it meant something different to each of them.

**{¶27}** Mundt attached to his post-conviction petition a letter from Dr. Ruben Gur, an independent psychologist, stating that a "quantitative MRI and FDG PET could be helpful in documenting likely developmental abnormalities in brain structure and function" as well as a 2001 article regarding quantitative PET findings. During his testimony at the evidentiary hearing Dr. Gur conceded that he did not personally examine Mundt, and admitted he did not base his conclusions on the findings of Jackson, Heiden or McPherson, all of which had interaction with Mundt. Dr. Gur offered no diagnosis and was unable to ascribe any connection between his findings and Mundt's criminal activity in 2002, and further acknowledged that he is not a medical doctor and psychologists do not receive formal training on MRI or PET scan results.

**{¶28}** Instead, Dr. Gur reached his conclusions by applying an algorithm patented in 1989 and created by him, his doctor-wife, and another individual. However, after 1990 there were no articles published that addressed the validity of the algorithm. When questioned further, Dr. Gur could only name one medical professional who used the algorithm in a clinical setting for diagnosis and treatment since 1989.

**{¶29}** Mundt argues that Dr. Gur's testimony demonstrates what could have been presented to the jury in mitigation, and because this information was not presented, the prejudice prong of *Strickland* has been established. However, the *Strickland* test mandates both prongs must be proven; deficient performance by counsel and prejudice. Mundt has failed to make a showing of deficient performance.

**{¶30}** The trial record demonstrates defense counsel retained three professionals to investigate Mundt's mental status and psychological state to present evidence for mitigation. It is entirely possible that these experts evaluated Mundt and decided that a neurological evaluation was unnecessary. "The defense decision to call or not call a mitigation witness is a matter of trial strategy." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶116. Moreover, as none of the trial experts were called to testify at the post-conviction hearing, any conclusions regarding what was or was not done, are speculative at best. It is improper to infer a defense failure to investigate from a silent record as the burden of demonstrating ineffective assistance is on Mundt. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 221. Thus, Mundt has failed to demonstrate that counsel were deficient by failing to have a neuropsychologist evaluate him. This renders his prejudice argument moot.

**{¶31}** Finally Mundt argues cumulative error as his eleventh claim. Under the doctrine of cumulative error, a judgment may be reversed when the cumulative effect of errors deprives a defendant of his or her constitutional rights, even though such errors are not prejudicial singularly. *State v. DeMarco*, 31 Ohio St.3d 191, 196–197, 509 N.E.2d 1256 (1987). As counsel does not draw this Court's attention to multiple instances of harmless error, the cumulative error doctrine is inapplicable. See *State v. Garner*, 74 Ohio St.3d 49, 64, 1995-Ohio-168, 656 N.E.2d 623. Accordingly, Mundt's eleventh claim is meritless.

**{¶32}** All eleven claims contained in Mundt's postconviction petition are barred by res judicata. Accordingly, the judgment of the Noble County Court of

Common Pleas dismissing his petition for postconviction relief is affirmed.

Donofrio, P. J.,

Robb, J.,

APPROVED:

_____

Mary DeGenaro, Judge