[Cite as *State v. Mundt*, 2026-Ohio-382.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
NOBLE COUNTY

STATE OF OHIO,

Respondent-Appellee,

v.

FREDERICK MUNDT,

Petitioner-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 NO 0525

---

Criminal Appeal from the
Court of Common Pleas of Noble County, Ohio
Case No. CR 204-2002

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed in part. Affirmed in part.

---

*Atty. Jordan C. Croucher,* Noble County Prosecutor, and *Atty. Stephen E. Maher*, Special Assistant Prosecuting Attorney, Senior Assistant Prosecuting Attorney General, Criminal Justice Section, Capital Crimes Unit, for Respondent-Appellee and

*Atty. Kimberly S. Rigby,* Managing Attorney, and *Atty. Cassandra S. Goodpaster,* Supervising Attorney, Death Penalty Department of the Office of the Ohio Public Defender, and *Atty. Donald J. Malarcik,* for Petitioner-Appellant.

Dated: February 5, 2026

**DICKEY, J.**

{¶1} Appellant, Frederick Mundt, appeals the March 14, 2025 judgment entry of the Noble County Court of Common Pleas overruling and dismissing his serious mental illness petition for postconviction relief ("SMI petition"). In his SMI petition, Appellant asks the trial court ("SMI trial court") to void his death sentence and resentence him to life without parole pursuant to R.C. 2929.025, captioned "Raising matter of serious mental illness, proceedings," ("SMI statute") and pursuant to the contemporaneous amendments to R.C. 2953.21, the postconviction statute.

{¶2} On appeal, Appellant raises six assignments of error. Appellant first argues the SMI trial court erred in denying his postconviction petition for relief pursuant to the SMI statute and applied an incorrect standard under the SMI statute. Because Appellant had a clinical diagnosis of Bipolar Disorder before the offense and Bipolar Disorder and Schizoaffective Disorder following the offense, we find the trial court abused its discretion when concluding Appellant had not been diagnosed with a qualifying condition under division (A)(1) of the SMI statute. However, we find the SMI trial court did not abuse its discretion when it relied on Appellant's conduct on the day of the offense and in the days that followed to conclude Appellant was capable of exercising rational judgment with respect to conforming his conduct to the requirements of the law and appreciating the nature, consequences, or wrongfulness of his conduct pursuant to division (A)(2) of the SMI statute. Evidence in the record concerning Appellant's actions prior to and after the offense is susceptible to two equally rational interpretations. Because our standard of review requires deference to the SMI trial court's interpretation of evidence, we find Appellant failed to prove by a preponderance of the evidence that his qualifying condition significantly impaired his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences, or wrongfulness of his conduct at the time of the offense, and we affirm the SMI trial court's dismissal of the SMI petition.

{¶3} Appellant also argues the SMI trial court improperly relied on testimony from the victim's mother in a pretrial competency hearing. The SMI trial court provided a list of the evidentiary materials that were admitted at the hearing on the SMI petition, which included the transcript of the victim's mother from the competency hearing, therefore

there was no error. Additionally, Appellant takes issue with the SMI trial court's finding that the expert testimony offered on his behalf at the hearing on the SMI petition was inadmissible and argues the trial court substituted its own opinion in place of a qualified expert. The SMI trial court did not find the expert's testimony was inadmissible, nor did it substitute its own judgment where uncontroverted expert testimony was offered. Lastly, Appellant argues the SMI trial court erred in declining to consider his Eighth Amendment arguments. The SMI trial court was without jurisdiction to consider these claims in Appellant's successive petition. We find the judgment of the SMI trial court is reversed as to its finding under division (A)(1) of the SMI statute, however the dismissal of the SMI petition is affirmed.

## THE SMI STATUTE

{¶4}   In 2021, the legislature made amendments to R.C. 2953.21(A)(1)(a)(iv) and 2953.21(A)(3)(b). These amendments were effective April 12, 2021 and permitted a person convicted and sentenced to death before April 12, 2021 to file a postconviction petition by April 12, 2022 asking the trial court to render void the sentence of death and to order resentencing under division (A) of section 2929.06 of the Revised Code. R.C. 2953.21(A)(1)(a)(iv). The filing of an SMI petition constitutes a waiver of any right to be sentenced under the law that existed at the time the offense was committed and constitutes consent to be sentenced to life imprisonment without parole under division (A) of section 2929.06 of the Revised Code. R.C. 2953.21(A)(3)(b).

{¶5}   Under division (A) of the SMI statute, a person has a "serious mental illness" if the preponderance of the evidence in the record establishes: (1) he has been diagnosed as described in division (B) of R.C. 2929.025 with Schizophrenia, Schizoaffective Disorder, Bipolar Disorder, or Delusional Disorder; and (2) at the time of the aggravated murder, the qualifying condition, while not meeting the standard to be found not guilty by reason of insanity or the standard to be found incompetent to stand trial, nevertheless significantly impaired his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct at the time of the offense. R.C. 2929.025 (A) and (D)(1).

Case No. 25 NO 0525

**{¶6}** Division (B) of the SMI statute reads in its entirety:

The diagnosis of a person with a condition or conditions described in division (A)(1)(a) of this section may be made at any time prior to, on, or after the day of the alleged aggravated murder with which the person is charged, or the day on which the person pursuant to division (C) of this section raises the matter of the person's serious mental illness at the time of the alleged commission of that aggravated murder. Diagnosis of the condition or conditions after the date of the aggravated murder for which the person is charged does not preclude the person from presenting evidence that the person had a serious mental illness at the time of the alleged commission of that offense.

**{¶7}** By comparison, in order to demonstrate a defendant is not guilty by reason of insanity ("NGRI"), he must prove by a preponderance of the evidence that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts. R.C. 2901.01(A)(14). However, "[p]roof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense." R.C. 2945.391. To establish a defendant is incompetent to stand trial, he must show by a preponderance of the evidence that he is incapable of understanding the nature and objective of the proceedings against him or to assist in his own defense as a consequence of a present mental condition.

## FACTS AND PROCEDURAL HISTORY

### A. UNDERLYING FACTS OF DIRECT APPEAL

**{¶8}** Appellant was convicted in 2004 of four counts of aggravated murder, each with death specifications, two counts of rape, and one count of kidnapping, for the brutal kidnapping, rape, and murder of B.H., the seven-year-old daughter of Appellant's girlfriend, M.H. M.H. and her children were cohabitating with Appellant when the crimes were committed.

{¶9}   The Ohio Supreme Court provided the following summary of facts and procedural history in Appellant's 2005 direct appeal:

On March 9, 2004, seven-year-old [B.H.] disappeared from her home in Noble County. The next day, searchers found [B.H.'s] raped, battered body hidden in a nearby abandoned well. Appellant, Frederick A. Mundt, was convicted of the aggravated murder of [B.H.] and sentenced to death.

The evidence at Mundt's trial revealed that [B.H.'s] mother, [M.H.], became acquainted with Mundt in 1999. She and her daughters, [B.H.] and [L.H.], soon moved into Mundt's house in Lower Salem, Noble County. In 2004, Mundt and [M.H.] lived there with [B.H.] and [L.H.], and their infant son, [S.M.] Mundt's mother, Sarah Mundt, lived nearby with her boyfriend Tim Bowman and their adult daughters, Mundt's half-sisters, Timica, Teresa, and Mary Anne Bowman.

During the late morning or early afternoon of March 9, 2004, Mundt visited the Biolife Plasma Services Plasma Center in Parkersburg, West Virginia to sell his blood plasma.

March 9, 2004, was a school day for [B.H.]. The school bus brought her home that day around 4:10 p.m., and her bus driver saw her go inside the house.

Five or ten minutes later, Mundt's stepfather, Tim Bowman, arrived. Bowman and Sarah, along with their daughter Mary Anne and her date, had plans to play bingo that night in Woodsfield, Ohio. Bowman came to invite [M.H.] to join them. After checking with Appellant, [M.H.] accepted. Bowman was at Mundt's house for five to ten minutes; during that time, he saw [B.H.] and [L.H.] at play.

[M.H.] fed her daughters about 4:45 p.m. Half an hour later, Bowman arrived at Mundt's house to pick [M.H.] up.

[M.H.] said goodbye and "told the kids to go upstairs with their dad [Mundt] when they [were] done eating." Although Bowman did not enter the house, he recalled hearing [M.H.] telling the girls to eat dinner and go upstairs.

Around 8:00 p.m., Mundt arrived at the Bowman residence with [L.H.] and [S.M.]. Timica and Teresa Bowman were present. Mundt asked Timica if [B.H.] was there and said, "[S]he ain't up home, and I have to find her." Leaving the children with Teresa, Mundt and Timica drove to Woodsfield.

They arrived at the bingo hall around 8:30 p.m. Mundt approached [M.H.] and asked if [B.H.] was with her. [M.H.] replied, "No, I left her there with you." She got up, grabbed her coat, and left with Mundt and Timica. The three then drove back to Mundt's house. At 9:18 p.m., [M.H.] called the Monroe County Sheriff's Office to report [B.H.] missing. Officers immediately began to search for [B.H.], a search that lasted into the next day.

On March 10, a civilian volunteer taking part in the search noticed a sheet of tin covering the opening of an old well on property near Mundt's house. Moving the tin revealed a chunk of concrete wedged into the opening of the well. The surface of the well water was visible around the sides of the concrete chunk. The volunteer looked into the well and saw a pair of green shoes floating amid some debris. The volunteer reported his find and led sheriff's deputies to the well.

The deputies recovered one of the shoes and brought it to [M.H.], who identified it as [B.H.'s]. Other officers removed the chunk of concrete and recovered [B.H.'s] body from the well.

Shortly after the officers recovered her body, Agents Gary Wilgus and William Hatfield of the Bureau of Criminal Identification and Investigation ("BCI") arrived at the crime scene. Wilgus noted numerous

abrasions and contusions on [B.H.'s] head. Her jeans were undone, and the leg bottoms partly covered her feet.

Hatfield found bloodstains and hairs on the chunk of concrete from the well. Hatfield later weighed and measured the chunk; it was 36 inches long and 14 inches wide at its widest point and weighed 254 pounds.

According to [M.H.], Mundt stated on the morning of March 10 that "they will probably pin this on him . . . because he was supposed to be the last one to see her."

Detective Sergeant Mark Warden and Lieutenant Seevers of the Washington County Sheriff's Office interviewed Mundt after [B.H.'s] body was found. Mundt asked whether a condemned prisoner could "choose between lethal injection and the gas chamber." Warden then informed Mundt that [B.H.'s] body had been found and that Warden "felt he was responsible for [her] death." Mundt denied it.

Warden noted that Mundt's forearms were scratched. Mundt claimed that the family dog had knocked him down some steps while he was looking for [B.H.]. When Warden expressed disbelief, Mundt merely hung his head. Biolife Plasma Services personnel later testified that Mundt did not have those scratches on his arm when he sold plasma on the morning of March 9.

Seevers asked Mundt whether [B.H.] could have been sexually assaulted. Mundt first said no, then asked, "Well, how would I know?" The officers then took a DNA swab and collected other trace evidence from Mundt's person. As Warden was cataloguing these items, Mundt asked: "Do you think I should die?" Warden replied, "Well, do you think you should be put to death?" Mundt said, "Yes."

Dr. P.S.S. Sreenivasa Murthy, a pathologist and deputy coroner for Stark and Wayne Counties, conducted an autopsy on [B.H.], assisted by Dr. Anthony Bertin, a urologist, who examined [B.H.'s] genitalia.

Dr. Murthy found that [B.H.] had extensive blunt-force head injuries. These included multiple lacerations and bruises, a skull fracture, and hemorrhaging and contusions of the brain. She also had blunt-force injuries to her trunk and extremities.

[B.H.'s] lungs were hyperinflated and contained excess fluid, leading Dr. Murthy to conclude that she had drowned in the well. But because [B.H.] was 47 inches tall while the water in the well was only 30 to 36 inches deep, Murthy concluded that [B.H.'s] injuries had left her unable to stand up. Murthy also concluded that given the severity of her injuries, [B.H.] would have died within 10 to 15 minutes. Thus, Murthy concluded that she died both of drowning and of her multiple blunt-force injuries.

Dr. Bertin, the urologist, observed that [B.H.'s] panties were soaked with blood. Her vaginal opening was "imploded," as if a large object had been forced into it. Her vaginal walls had been "ripped apart," with deep, full-length lacerations on both sides. In Dr. Bertin's opinion, a rigid object, approximately two and one-half inches in diameter, had been forced up [B.H.'s] vaginal canal with "considerable force."

Diane Larson, a BCI forensic scientist, examined numerous evidentiary items. Those yielding significant DNA evidence included vaginal swabs taken during [B.H.'s] autopsy, fabric cut from the crotch of [B.H.'s] panties, a bloodstained bedsheet found on the bed in Mundt's master bedroom, and a bloodstained shirt found in Mundt's bathroom and identified as his.

Larson found sperm cells on the vaginal swabs and on [B.H.'s] panties. She identified a mixture of two DNA profiles on the sperm fraction

of the vaginal swabs. One of the mixed profiles was consistent with Mundt; the other was consistent with [B.H.]. The proportion of the population that could not be excluded as a possible contributor to that mixture was one in 203,800.

On the panties, Larson identified "two clean separate DNA profiles." The major profile, or largest amount, came from sperm and was consistent with Mundt's DNA. The expected frequency of the major profile was one in approximately 39 quadrillion, 350 trillion persons. The minor profile was consistent with [B.H.'s] DNA.

On the bedsheet, DNA testing showed a mixture of two DNA profiles. The major profile was consistent with Mundt's DNA; the minor profile was consistent with [B.H.'s]. The expected frequency of the minor profile was one in 146 million persons.

Mark Losko, another forensic scientist at BCI, testified that testing on Mundt's shirt revealed a mixture of two DNA profiles. The major profile was consistent with [B.H.'s] DNA. The expected frequency of that profile was one in 4.7 quadrillion persons. The minor profile was consistent with Mundt's DNA.

After Mundt's arrest, his half-brother, Johnny Mundt, visited him in jail. Johnny testified that he asked Mundt "if he done it." Mundt admitted that he had raped [B.H.]. Then he asked Johnny "if I can get the stuff out of the house." Mundt told Johnny that "the stuff" was behind the stereo. Johnny agreed to remove it.

On April 24 and 25, 2004, while Mundt was incarcerated in the county jail, he had several telephone conversations with Johnny. In these conversations, Mundt repeatedly urged Johnny to remove and destroy certain "stuff" or "trash" located in the wall behind the stereo in Mundt's

house. The sheriff's office recorded these conversations, and the state introduced them at trial.

These recordings convey Mundt's sense of urgency and concern for secrecy because he continually expressed his anxiety about when Johnny was going to burn the "trash" and whether he had burned "all of it." He warned Johnny that their conversation was being taped and reminded him several times not to let their mother see him burning the "trash."

On April 24, Mundt asked Johnny: "Hey, did you get all that stuff out of there where the radio is? . . . Would you be able to get that out?"

Mundt continued:

"You going to burn that stuff? . . . Well, make sure Mom ain't down there when you get burning that. . . . I really – really hope you can do that for me."

"You, uh, sure you can get that stuff out of there? . . . I'm really a-hoping. . . . 'Cause I'm really wanting that stuff out of there. You hear? . . . Make sure you get it all."

"Yeah, I hope you do that, take – take that trash out. Out – out back of the stereo. I really need to get that out of the house. You hear? . . . Back behind the stereo, yeah. Where the wall's at? . . . Down in there. . . . You going to burn all that? . . . That would do me a lot of good."

On the following day, Mundt talked to Johnny three more times. In the first of these conversations, Mundt asked: "Did you get all that trash burnt?" Mundt explained that the "trash" was hidden in the wall to the left of the stereo "where the insulation [was] moved," approximately two feet away from the drywall. He instructed Johnny to "find all that trash" and "get rid of that for me and burn it. . . . Don't have Ma and them up there." He also warned Johnny that "[t]his telephone's taped."

In their second conversation on April 25, Mundt pressed Johnny: "Did you get it? . . . Did you get all of it? . . . Make sure you burn all that trash. . . . Mom and them can't see that."

In his third April 25 conversation with Johnny, Mundt again asked: "Did you make sure that other trash is burnt?" He told Johnny to "make sure that burns up nice and good. . . . Make sure there ain't nothing left of it. . . . 'Cause they be up there looking through that next." Johnny said, "They're done up there, they ain't gonna go back up there." Mundt replied, "Don't bet on it."

According to Johnny, he eventually found "a little hole" in the corner of a room in Mundt's house. In that hole, Johnny found a pair of boxer shorts, a T-shirt, a pair of girl's socks, and a pillowcase, each spattered with blood. Johnny put these items into a box and hid the box in another part of the house. The next day, he took the box home and burned it with the bloodstained items inside.

On April 26, Mundt talked to Sarah Mundt from jail. The sheriff's office recorded this conversation. Sarah mentioned that Johnny had been burning things the night before, including a box. Mundt had his mother describe the box, then asked: "He burn it?" Mundt pressed Sarah for details: "Did you go up with him last night? . . . Did he pour gas on all that trash? . . . Did it burn?"

On May 3, 2004, police searched Mundt's house again. In a second-floor room, between a floor joist and the exterior wall, they found the space where Mundt had hidden the bloodstained items.

Police cut out a section of the floor joist from the hiding place. The joist tested positive for blood. Mark Losko, the BCI forensic scientist, found a mixture of two DNA profiles on the joist. The major contributor's DNA profile was consistent with [B.H.'s] and would be found in one of 4.7

quadrillion persons. The minor contributor's DNA profile was consistent with Mundt's and would be found in one of 139 persons.

On June 19, Mundt had yet another phone conversation with his mother from jail, and this too was recorded by the sheriff's office. Mundt urged his mother to remove his weights from his house: "You need to get those weights out of there. . . . They'll use that against me. . . . They'll try to say that I lifted those things down there. . . . Well, at least take some of the weights off the weight bench. . . . Did you take any weights off it?"

. . .

At trial, the jury found Mundt guilty of four counts of aggravated murder, each with four death specifications; two counts of rape, R.C. 2907.02(A)(1)(b) and (A)(2); and one count of kidnapping.

Before the penalty phase, the trial court merged the four aggravated-murder counts into a single count of aggravated murder under R.C. 2903.01(C) (murder of a child under 13) and merged the four specifications into two: murder to escape detection, apprehension, trial, or punishment for another offense, R.C. 2929.04(A)(3), and murder committed during a kidnapping, R.C. 2929.04(A)(7).

The jury recommended that Mundt be sentenced to death for his aggravated-murder conviction. The trial judge sentenced Mundt to death.

*State v. Mundt,* 2007-Ohio-4836, ¶ 1-45.

**{¶10}** Among the eleven assignments of error in his direct appeal, Appellant alleged several ineffective assistance of counsel claims. His chief claim of ineffectiveness during the penalty phase was his trial counsel's presentation of testimony that conceded Appellant's guilt, which contravened Appellant's theory of the case during the guilt phase of his trial. Relevant to the SMI petition, the Ohio Supreme Court provided the following summary of the psychological evidence offered during the penalty phase:

During the penalty phase, Mundt presented the testimony of Marsha Heiden, a psychologist and mitigation specialist, and Dr. Sandra McPherson, a psychologist. Heiden interviewed Mundt on several occasions, investigated his background, administered a psychological test, and wrote a report. McPherson also interviewed Mundt; administered, scored, and interpreted psychological tests; reviewed background material gathered by the defense; and arrived at a diagnosis of Mundt's mental condition.

Heiden noted in her report, and admitted on cross-examination, that Mundt had changed his story. Initially, Mundt told Heiden a story consistent with his guilt-phase position that although he had raped [B.H.], he had not taken her to the well or killed her. Mundt later changed his story, admitting to Heiden that he had put [B.H.] in the well after raping her, first claiming that he had thrown rocks at her, but later stating that he had placed rocks over the well opening and a rock fell on her, and that he acted alone.

Mundt also gave differing accounts of the crime to Dr. McPherson. McPherson testified that at first, Mundt "admitted to having violated [B.H.] sexually." Mundt told McPherson that he became "extremely frightened" when she began bleeding, and he was going to take her to the hospital, but abandoned that plan because he was afraid of what would happen. Instead, he took her to the well, thinking "that he would leave her there until he figured out what to do." Later, however, Mundt told McPherson that [M.H.] was "the primary aggressor," that she had used a dildo on [B.H.], and that Johnny had helped Mundt take the body to the well. McPherson testified: "Fred is not a good historian and tends to respond out of whatever is effective at the moment."

Mundt argues that defense counsel rendered ineffective assistance by presenting the testimony of McPherson and Heiden because their

testimony revealed that, contrary to the guilt-phase defense theory, Mundt had indeed murdered [B.H.].

Mundt argues that McPherson and Heiden hurt his case in three ways: first, their testimony eliminated any doubt the jury may have retained as to the degree of Mundt's involvement in [B.H.'s] murder, such as whether Mundt was the principal offender; second, it sacrificed defense counsel's credibility, since counsel had argued Mundt's innocence in the guilt phase; third, it "demonized" Mundt.

In reality however, McPherson and Heiden also gave testimony that was potentially valuable as mitigation. McPherson diagnosed Mundt as having several psychological disorders, including borderline personality disorder. *See State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 120 (borderline personality disorder is a relevant mitigating factor). McPherson indicated that those disorders were caused by a factor (an unstable, abused childhood) beyond Mundt's control. Furthermore, she found a causal link between the disorders and the killing of [B.H.].

Mundt's admission to murdering [B.H.] was part of the information that formed a basis for McPherson's diagnosis. McPherson testified: "I want to know what people think and what they feel in the course of a crime of this type." Mundt's statements were "important" because they illustrated the "thinking process . . . characteristic of [Mundt] when he's under any kind of high arousal state." To McPherson, Mundt's thoughts during the crime exemplified "pure borderline thinking" and thus supported her diagnosis.

Mundt's borderline thinking also supported McPherson's view that Mundt's disorder caused him to commit the murder. McPherson explained that Mundt engages in "narrow" thinking under stress, focusing only on getting out of the stress-inducing situation. Hence, he tends to act upon "whatever first [comes] to mind," even though his course of action might not make sense. According to McPherson, Mundt became stressed when he

realized he was in trouble for raping [B.H.]. The solution that "first came to mind" was to put her in the well, and Mundt's disorder caused him to focus on that course of action, without considering consequences or alternatives.

Heiden presented Mundt's life history, which was potentially mitigating in itself, and which McPherson had used in diagnosing Mundt.

*Id.* at ¶ 123-131.

{¶11} The Ohio Supreme Court rejected Appellant's ineffective assistance of counsel claim during the penalty phase, finding the testimony of McPherson and Heiden was not prejudicial because it is not reasonably probable that the penalty-phase outcome would have been different if counsel had forgone their testimony. Specifically, the Ohio Supreme Court found Appellant's guilt-phase theory – that Appellant had raped B.H., but that M.H., Johnny Mundt, or someone else had kidnapped and murdered her – was implausible and unsupported by credible evidence. Consequently, the Ohio Supreme Court concluded Appellant's argument that jurors may have been convinced that he was not solely responsible for the aggravated murder during the guilt phase was speculative and insufficient to show prejudice.

{¶12} Next, Appellant argued his trial counsel was ineffective during the penalty phase for not offering any expert testimony about his cognitive deficits. The trial court overruled Appellant's pre-trial motion to be declared "mentally retarded" and therefore ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and *State v. Lott*, 2002-Ohio-6625. Witnesses at the *Atkins* hearing included Robert Willis and Constance Kline Brady, Ph.D., testifying for the defense, and Jeffrey Stevens, testifying for the state. The Ohio Supreme Court summarized the testimony at the *Atkins* hearing as follows:

Willis was the special-education supervisor for the Switzerland of Ohio School District. Dr. Brady was a school psychologist who examined students to determine whether they have learning disabilities. Willis and Brady based their testimony on Mundt's school records. Stevens was the vocational special-educational coordinator at Mundt's high school. It was

his job to assist learning-disabled ("LD") and developmentally handicapped ("DH") students with their studies. His testimony was based on personal knowledge of Mundt, as well as Mundt's records.

Brady testified that, at age 12, when Mundt attended school in the Marietta school district, his IQ scores were 82 and 85, consistent with a learning disability. The Marietta schools had classified Mundt as LD. However, when he later attended high school in the Switzerland of Ohio school district, he was classified as DH. Brady and Willis testified that at the time Mundt was classified as a DH student, an IQ measurement of 80 or less was one of the prerequisites for that designation.

Stevens testified that Mundt had studied cosmetology in a vocational program. Although Mundt had struggled academically as a DH student, he had performed tasks to the best of his ability. In a 1995 evaluation, Stevens had rated Mundt's daily attendance as good.

Brady testified that when Mundt was 15, he could read at only a second-grade level. Stevens testified that, as a junior and senior, Mundt read at only a second-grade level and had difficulty with written instructions. It was necessary to speak slowly and clearly to Mundt and to repeat until he understood. Mundt did not retain information well and had a short attention span. Despite receiving special help, he was barely able to keep up with his cosmetology class. He needed extra time to complete most tasks and worked slowly, but persistently.

Stevens and Willis testified that Mundt had received several "E" grades in high school. Stevens, Willis, and Brady explained that an "E" was a grade given in place of an "F" to a special-education student who had failed to earn a passing grade but had put forth reasonably good effort and done his best.

*Mundt*, 2007-Ohio-4836, at ¶ 150-154.

**{¶13}** Finally, the Ohio Supreme Court undertook an independent sentence review. Relevant to the SMI petition, the Ohio Supreme Court provided the following analysis of the aggravating and mitigating factors:

Aggravating Circumstances

After the trial court's merger of specifications, two aggravating circumstances remain: R.C. 2929.04(A)(3) (murder to escape detection, apprehension, trial, or punishment) and R.C. 2929.04(A)(7) (murder while committing kidnapping). The record supports the jury's finding of these aggravating circumstances.

Mitigating Factors

Mundt cites his history, character, background, low intelligence, and mental disorders as mitigating. He also claims that he has no significant criminal history, a mitigating factor under R.C. 2929.04(B)(5). Finally, he contends that his good behavior in jail, his lack of future dangerousness while imprisoned, and his remorse are mitigating "other factors" under the catchall provision of R.C. 2929.04(B)(7). At trial, he also claimed his youth was a mitigating factor under R.C. 2929.04(B)(4).

The record demonstrates that Mundt was a special-education student, and that the Marietta school system classified him as learning-disabled. By 1989, when he was attending school in the Switzerland of Ohio district, Mundt had been reevaluated as developmentally handicapped. IQ tests administered during his scholastic career indicate that his intellectual functioning was "borderline." However, he attended school and earned several grades of "E," meaning that he put forth his best effort but did not qualify for a passing grade.

In 1995, Mundt applied for Social Security disability payments, claiming to be mentally retarded. After he took a Wechsler Adult Intelligence Scale ("WAIS") examination, his application was granted. The 1995 WAIS

indicated an IQ of 49. Mundt's benefits were terminated in 2002, when his work income exceeded the allowable amount, but were reinstated in 2004.

Dr. David Ott, the state's expert witness in psychology, interviewed Mundt before trial. In the penalty phase, Dr. Ott testified that his observations of Mundt were "very inconsistent with" an IQ of 49 and indicated a much higher level of functioning than others in that range. According to Dr. Ott, a person with a 49 IQ would need 24-hour supervision. Moreover, Mundt's IQ ranged between 78 and 85 when measured by IQ tests administered in childhood. Ott concluded that Mundt had "intentionally underperformed" on the WAIS in order to get disability payments.

Mundt's low intelligence and the efforts that he made in high school despite that handicap are mitigating factors under R.C. 2929.04(B)(7). *See, e.g., State v. Green* (1993), 66 Ohio St.3d 141, 153, 609 N.E.2d 1253. However, their mitigating value is affected by Mundt's malingering on IQ tests as an adult, in order to obtain disability benefits.

Mundt contends that his childhood was one of "chaos, abuse, and neglect," which caused him to suffer from borderline personality disorder.

The evidence confirms that Mundt had an unstable childhood. His mother, Sarah Mundt, had children by four different fathers, and seven of her eight children were born out of wedlock. The family moved frequently during his childhood. In 1975, a children's protective agency removed Mundt from Sarah Mundt's custody for approximately one month. In 1979 or 1980, Sarah voluntarily surrendered custody of her children because she had no home.

During his childhood, children's services agencies investigated numerous reports of abuse and neglect in Sarah Mundt's household. However, some of these reports were unsubstantiated.

Dr. Ali Melhem, a psychiatrist, testified that he treated Mundt from December 2003 to February 2004. Melhem initially suspected bipolar disorder and intermittent explosive disorder, but ultimately diagnosed Mundt as having bipolar disorder.

Mundt also presented evidence that he suffered from borderline personality disorder. Dr. McPherson interviewed Mundt, tested him, discussed his background with the mitigation specialist, and reviewed his Social Security, school, mental-health, and children's services records.

Dr. McPherson gave Mundt the MMPI-2 test, the Rorschach test, and the Thematic Apperception Test ("TAT"). McPherson found that Mundt overstated his responses on the MMPI-2. Nevertheless, McPherson felt that the MMPI-2 results "were not useless." Some features of the MMPI-2 were consistent with aspects of his life history, such as childhood abuse, drug use, and depression.

McPherson's examination of Mundt led her to conclude that "under threat, he tends to deal with the world by narrowing perception," i.e., by refusing to be aware of problems. Thus, "[w]hen a problem presents itself, he's mainly going to look for a way to get away from it, rather than a way to deal with it." Mundt's low intelligence also contributes to this tendency.

Moreover, Mundt "doesn't process emotion" and lacks a normal capacity to identify with another person's pain. He tends to "blam[e] the world" for his problems "as opposed to looking within." He has a "negative self concept" and is not goal-oriented.

According to Dr. McPherson, narrow perception, low capacity for emotional response, and externalizing blame are characteristic qualities of persons who have been traumatized or suffered early abuse.

Dr. McPherson diagnosed Mundt as having depression, posttraumatic stress disorder, pedophilia, and borderline personality

disorder. McPherson noted that bipolar disorder and borderline disorder "overlap substantially," and she was not "in substantial disagreement" with Dr. Melhem's diagnosis of bipolar disorder. However, Mundt was not psychotic or schizophrenic; in fact, he had no major mental illness.

Mundt told McPherson that during the crime, he had thought about "himself getting messed with" as a child and thought "it might be okay" if he "messed with" [B.H.]. According to McPherson, this was "pure borderline thinking," illustrating "a confusion of identity" and the "notion that somehow this reduces responsibility." McPherson believed that when confronted with an upsetting situation, Mundt simply does whatever first comes to mind, whether it makes sense or not, and that he did so in this case.

According to Dr. Ott, Mundt's malingering invalidated the MMPI-2 results. Dr. Ott also questioned the validity of the TAT results. In Dr. Ott's view, Mundt's responses to the TAT were consistent with his pattern of "impression management." Ott also testified that the TAT itself is "controversial," particularly for courtroom use, because no norms for interpreting responses exist, allowing for "considerable subjectivity" on the part of the examiner.

Mundt's history, character, and background evidence depicts a person who, because of factors beyond his control – an unstable home, alleged childhood abuse and neglect, a personality disorder, and low intelligence – lacks the ability to empathize with others or to deal appropriately with a situation.

While there is evidence that supports this picture, the record also contains evidence that tends to refute it. Dr. McPherson admitted that Mundt had overstated his psychological symptoms and that his word was unreliable. Ott testified that two tests McPherson had used to reach her diagnosis were of questionable validity because of Mundt's malingering and because one of them (the TAT) is interpreted subjectively.

We accord little weight to Mundt's personality disorders as a mitigating "other factor." *See State v. Taylor* (1997), 78 Ohio St.3d 15, 33, 676 N.E.2d 82. Furthermore, Mundt's upbringing is entitled to little weight in mitigation. Cf. *State v. Murphy* (2001), 91 Ohio St.3d 516, 547, 747 N.E.2d 765; State v. Campbell (2002), 95 Ohio St.3d 48, 51–54, 765 N.E.2d 334.

This court recently reversed a death sentence largely on the basis of the defendant's upbringing. *See State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386. *Tenace*, however, is distinguishable. Tenace's parents lived criminal lifestyles and actively encouraged the defendant and his siblings to commit crimes. *Id.* at ¶ 88–90, 96, 101–103. The record in this case presents nothing comparable to *Tenace*. Moreover, Mundt's siblings overcame their upbringing; at least two were employed, and all but Johnny were law-abiding. This was not the case in *Tenace*. *See Id.* at ¶ 82, 96, 102.

Mundt contends that he lacks a "significant history of criminal convictions," R.C. 2929.04(B)(5), and the state concedes the existence of this mitigating factor. However, Mundt has a prior misdemeanor conviction for domestic violence against his first wife, Dana Anderson, for which he served a 30-day sentence.

This factor of lack of criminal history is entitled to little weight. Mundt's prior conviction was for domestic violence, and the instant case also involves violence against a member of Mundt's household. Moreover, Dr. McPherson testified that Mundt "is dangerous . . . in a domestic context because . . . he will do something stupid and something terrible at times."

McPherson testified that, although Mundt had committed crimes in a domestic context, he would probably not engage in aggression if incarcerated. This is evidence in mitigation that we consider, for "evidence that the defendant would not pose a danger if spared (but incarcerated)

must be considered potentially mitigating." *Skipper v. South Carolina* (1986), 476 U.S. 1, 5, 106 S.Ct. 1669, 90 L.Ed.2d 1.

*Mundt* at ¶ 185-209.

**{¶14}** The Ohio Supreme Court affirmed Appellant's convictions and sentence. Appellant filed two postconviction petitions in 2016 and 2017, which were dismissed on procedural grounds. We affirmed the dismissal of the first petition based on res judicata. *State v. Mundt,* 2016-Ohio-4802 (7th Dist.). We affirmed the dismissal of the second petition as untimely filed. *State v. Mundt*, 2017-Ohio-7771 (7th Dist.).

**{¶15}** Appellant filed a federal habeas corpus petition which is currently pending in the Southern District of Ohio. *Mundt v. Jenkins*, 2:17-CV-773. A report and recommendation issued by the magistrate judge on April 29, 2024 advocates dismissal of all ten of the grounds for relief in the petition. Objections to the report and recommendation were filed by Appellant on June 25, 2024. The response of the warden was filed on July 16, 2024. Appellant's reply was filed on July 29, 2024.

**{¶16}** A federal habeas corpus petitioner may not appeal a decision of the district court unless the district court issues a certificate of appealability ("COA"), which requires the district court to find reasonable jurists could reach the opposite conclusion regarding the existence of a constitutional violation. Relevant to Appellant's SMI petition, the report and recommendation advocates for the issuance of a COA in the federal habeas corpus action with respect to Appellant's claim for relief that his trial counsel was ineffective for failing to discover Appellant's organic brain damage. Although not relevant here, the report and recommendation also advocates for the issuance of a COA with respect to Appellant's constitutional challenges to voir dire and his trial counsel's decision to offer testimony conceding Appellant's guilt during the penalty phase of the proceedings.

## B. <u>THE HEARING ON THE SMI PETITION</u>

**{¶17}** Appellant filed his timely postconviction petition pursuant to the SMI statute on April 5, 2022. Following an evidentiary hearing on the SMI petition, where the SMI trial court heard the testimony of the parties' respective experts, it concluded Appellant failed to show he suffered from Bipolar Disorder or Schizoaffective Disorder as required by

division (A)(1) and (B) of the SMI statute. The SMI trial court concluded in the alternative, even assuming Appellant satisfied his burden under division (A)(1) and (B) of the SMI statute, that Appellant's Bipolar Disorder and/or Schizoaffective Disorder did not significantly impair his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct at the time of the offense, failing to meet the requirements in division (A)(2) of the SMI statute.

**{¶18}** Appellant contends the SMI trial court abused its discretion with respect to both divisions (A)(1) and (A)(2) of the SMI statute. Appellant asserts the SMI trial court applied the wrong evidentiary standard in its analysis of the facts at division (A)(1) by importing elements of the rigid NGRI and competency standards into the SMI statute, despite the clear legislative intent to fashion a lesser standard for SMI petitions. Applying the correct standard, Appellant argues the SMI trial court would have concluded he was diagnosed with Bipolar Disorder prior to the offense and Bipolar Disorder and Schizoaffective Disorder after the offense. Appellant further argues the trial court abused its discretion in concluding his qualifying conditions did not significantly impair his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law when he committed the offense. Based on Appellant's theory that the state's expert testimony was predicated upon the application of the heightened NGRI/competency standard, Appellant asks us to vacate the March 14, 2025 judgment entry and remand for a de novo hearing on the SMI petition.

**{¶19}** The state counters Appellant's pre-offense diagnosis of Bipolar Disorder was properly rejected by the SMI trial court because the diagnosing physician did not confirm Appellant's self-reported symptoms with members of Appellant's family, and the physician was not aware Appellant had conceded to family members at the time that he was overstating his symptoms in order to acquire social security benefits. The state reasons the pre-offense diagnosis was a "clinical" rather than "forensic" diagnosis, which was predicated exclusively upon Appellant's self-reported symptoms, and therefore insufficient to satisfy division (A)(1) of the SMI statute. According to the state, division (A)(1) of the SMI statute requires a forensic diagnosis of a qualifying condition, which involves an investigation beyond Appellant's self-reported symptoms.

{¶20} With respect to division (A)(2) of the SMI statute, the state argues there is no evidence in the record that Appellant was acutely psychotic or symptomatic prior to or immediately following the rape. The state further argues Appellant's efforts to conceal the rape then the aggravated murder, both immediately following the rape and in the weeks following his arrest, demonstrate his serious mental illness did not significantly impair his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciate the nature, consequences or wrongfulness of his conduct at the time of the offense.

{¶21} Two expert witnesses provided testimony at the hearing on the SMI petition, Diane Mosnik, M.D., Ph.D., a forensic psychologist and clinical neuropsychologist on behalf of Appellant, and Jaime Adkins, Ph.D, a forensic psychologist on behalf of the state. Both testified they were employed by the respective parties to provide an unbiased opinion regarding the impact of Appellant's alleged serious mental illness on his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law and to appreciate the nature, consequences or wrongfulness of his conduct at the time of the offense.

{¶22} Mosnik opined Appellant's Bipolar Disorder and Schizoaffective Disorder significantly impaired his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law and appreciating the nature, consequences or wrongfulness of his conduct when he committed the offense. Adkins opined Appellant did not suffer from Bipolar Disorder or Schizoaffective Disorder, and assuming arguendo that he did, it did not significantly impair his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct at the time of the offense.

{¶23} In addition to the testimony offered at the hearing on the SMI petition, the record includes a lengthy history of Appellant's mental health treatment, both before and after the offense, with three periods of sustained treatment, 1996-1999, 2003-2004, and 2004 to the present. Also included are the results of neuropsychological testing performed by Mosnik, as well as clinical interviews conducted by both Mosnik (in-person) and Adkins (by videoconference).

**{¶24}** In 1996, Appellant, age 21, sought counseling at Community Mental Health Services ("CMHS") as a consequence of domestic abuse allegations by his then wife, Dana Anderson. Appellant's counselor at CMHS referred him for psychological testing.

**{¶25}** Psychology Assistant Scott Hedrick conducted a clinical interview and observed Appellant "was extremely anxious, often stood while talking, talked at a rapid pace and paced the floor, occasionally appearing to lose his balance while standing or rocking." Appellant's thinking "appeared to be scattered and confused," and he "repeatedly forgot his train of thought, usually mid-sentence, and had no idea what the current date was." Appellant reported difficulty sleeping, and that he would walk around until 5 or 6 a.m. and needed to be busy at all times. While Hedrick noted that there were some inconsistencies in Appellant's reporting, Hedrick opined Appellant "appear[ed] to be quite genuine in his discussion of his situation." (CMHS records, p. 1733-1735.)

**{¶26}** As a result of Hedrick's clinical observations and testing, he diagnosed Appellant with "Bipolar Disorder, Not Otherwise Specified," and referred him for a psychiatric evaluation "to determine if the initiation of pharmacotherapy is appropriate." (*Id.* at p. 1736; 9/9/24-9/10/24 SMI Hrg. Tr. ("Hrg. Tr."), p. 134.) Hedrick noted it "may also be helpful in his counseling to approach therapy with the knowledge that [Appellant] likely suffers from a mood disorder." Following the referral, Appellant was prescribed Vistaril and Effexor. (CMHS records, p. 1789-1790; Hrg. Tr., p. 56-57.) Vistaril is an antihistamine prescribed off-label for the treatment of psychoneurotic conditions. (Hrg. Tr., p. 57.) Effexor is an antidepressant. (*Id.* at p. 56-57.)

**{¶27}** Appellant continued receiving services at CMHS from 1996 to 1999, where he was subsequently diagnosed with Dysthymic Disorder (with a rule out for Major Depressive Disorder), Post-Traumatic Stress Disorder ("PTSD"), attributed to his violent childhood, Generalized Anxiety Disorder, and Intermittent Explosive Disorder. Mosnik explained these diagnoses were not divergent or inconsistent, because "in the [Diagnostic and Statistical Manual of Medical Disorders ("DSM")] there's significant overlap across diagnostic categories about individual symptoms." (*Id.* at p. 46.) According to Mosnik, the phrase "rule out" indicates a strong consideration for the mental disorder that must be further investigated. (*Id.* at p. 62.) She further testified the CMHS providers, with different

levels of training and experience, were "try[ing] to best find a diagnosis that explains the symptoms they're hearing at the time." (*Id.* at p. 58-59.)

**{¶28}** More specifically, Mosnik testified PTSD and Generalized Anxiety Disorder can be precursor diagnoses to or concurrent diagnoses with Bipolar and Schizoaffective Disorders. (*Id.* at p. 49.) Episodes that are symptomatic of Intermittent Explosive Disorder can also occur in Bipolar and Schizoaffective Disorders. The mood symptoms of Dysthymia and a Major Depressive Episode "are part and parcel of Bipolar Disorder." (*Id.*) All of these diagnoses were based on personal encounters with providers at a particular moment in time.

**{¶29}** Appellant returned to CMHS in October 2003, roughly five months before the offense, where he was again diagnosed with Bipolar Disorder. Appellant reported symptoms of Attention Deficit Hyperactivity Disorder, anger, and anxiety. Appellant represented that he "consider[ed] himself a risk to hurt somebody if he [did] not stay isolated with his family." (CMHS records, p. 1796.)

**{¶30}** Following an intake evaluation by social worker Tim Bowman (who shares the same name as Appellant's stepfather, who Appellant alleges had violently assaulted him and his mother during his childhood), Appellant was given a rule out diagnosis for "Bipolar Disorder, Not Otherwise Specified, mixed episode." Bowman also noted PTSD marked by intrusive childhood memories. In addition to Appellant's allegations of physical abuse by his stepfather, Appellant alleges he was sexually abused at age seven by an uncle.

**{¶31}** Bowman referred Appellant to Melhem. (Hrg. Tr., p. 62-63, CMHS records at 1802-1803.) During Melhem's initial psychiatric assessment on December 2, 2003, Appellant informed Melhem that Appellant's biggest problem was that he "gets very upset." (12/7/04-12/8/04 Mitigation Hrg. Tr. ("Mit. Hrg. Tr."), p. 5618.) Based on Melhem's psychological assessment and a review of Appellant's psychiatric history, Melhem's initial differential diagnosis was "[r]ule out Bipolar Disorder, mixed presentation. And also rule out intermittent explosive disorder." (*Id.* at p. 5622-5623.) Melhem prescribed Trileptal, which was commonly prescribed in the treatment of Bipolar Disorder and Impulsive Control Disorder.

{¶32} When Appellant returned to Melhem for a follow-up appointment on January 12, 2004, Appellant reported the prescribed medication had not ameliorated his problems. (Mit. Hrg. Tr., p. 5629-5630; Hrg. Tr., p. 64.) Melhem observed Appellant was cooperative, but "wasn't able to sit still during the interview. He was quite talkative. He wasn't pressured or fast. He had an extremely intense affect with a lot of anger and irritability and the use of profane words." (CMHS records, p. 1804.)

{¶33} Appellant reported he "walk[ed himself] out" and "he [got] in trouble" on the days when he did not sleep. Melhem described Appellant as "go[ing] into much detail about instances of anger and irritation." Melhem observed these behaviors were the symptoms of "racing thoughts, hyperactivity, and agitation." Based on Melhem's second encounter with Appellant, Melhem had "more certainty" and "ruled in" the diagnosis of Bipolar Disorder. (*Id.*; Mit. Hrg. Tr., p. 5633; Hrg. Tr., p. 62-63, 253.)

{¶34} Melhem prescribed an initial dose of Zyprexa, an antipsychotic medication, with instructions to increase the dosage after three days, "to target mood instability and poor impulse control." (CMHS records, p. 1804; Hrg. Tr., p. 64.) A few weeks later, at Appellant's February 17, 2004 appointment, Melhem again increased the dosage of Zyprexa, and added Lamictal, a mood stabilizer. (Hrg. Tr., p. 71.) Both medications are used to treat Bipolar Disorder and Schizoaffective Disorder. (*Id.* at 64, 74.) Melhem testified during the mitigation proceedings that his initial diagnosis of Bipolar Disorder was confirmed at Appellant's following two visits based on Appellant's response to the prescribed medication. (Mit. Hrg. Tr., p. 5636-5637.)

{¶35} Appellant attended a counseling session with Bowman on February 19, 2004, during which Bowman recommended methods of anger management, including the recognition of "tension build-up." However, Appellant explained his anger occurs from a "sudden reaction," rather than mounting tension. (CMHS records, p. 1801.)

{¶36} At Appellant's February 19, 2004 session, his final CMHS appointment before the offense, Appellant reported he was "stable" and was experiencing better sleep. The offense occurred on March 9, 2004 – just 21 days after Appellant was last seen at CMHS. (Hrg. Tr., p. 71.) Appellant conceded he had discontinued his prescribed medication one week prior to the offense due to stomach upset.

Case No. 25 NO 0525

**{¶37}** Even assuming Appellant had continued to take the prescribed dosage, Mosnik opined the medication had not reached therapeutic levels when Appellant committed the offense. She testified:

> [T]he Lamictal was just initiated and was not up to its max[imum] dose. That was just three weeks prior to the date of the offense. And the Zyprexa had been started on the January 12, 2004 visit, but again at a subclinical dose and then that was increased on the February 17th visit, so those were only three weeks out. So if he had been taking them at a hundred percent since the 17th, they would still be at a subclinical level and wouldn't have reached maximum efficacy in terms of the alleviation of the acute exacerbation of the Bipolar episode.

(Hrg Tr., p. 71-72.)

**{¶38}** Appellant was arrested on March 11, 2004. Five days later while in custody, he was seen at Southeastern Ohio Regional Medical Center. (Hrg. Tr., p.73.) Appellant was again prescribed Lamictal and Zyprexa, and a prescription for Xanax was added to address anxiety. (*Id.* at p. 74.) Mosnik testified Appellant's prescribed medications "are serious medications with serious physical potential side effects . . . they are not given lightly without significant evidence to support their use in treating serious mental illness." (*Id.* at p. 75.) While housed in the county jail awaiting trial, Appellant continued to be prescribed Zyprexa and Lamictal. (*Id.* at p. 80.)

**{¶39}** Appellant was sentenced to death on December 15, 2004 and transferred to the custody of the Ohio Department of Rehabilitation and Correction ("ODRC"). On December 19, 2004, Appellant was referred to Mental Health Services as he appeared "markedly depressed with psychomotor slowing, delayed response time, dysphoric mood, impairment in both concentration and short-term memory, disturbed sleep pattern, poor appetite, dazed facial expression, drooling and intermittent tearfulness." (Hrg. Tr., p. 79; Mansfield Correctional Institute ("MCI"), Def. Ex. L, Appx. 5099.) The referral noted Appellant had suicidal thoughts. (Hrg. Tr., p. 80; MCI records, Ex. L, p. 5101.)

{¶40} In Appellant's initial ODRC mental health evaluation, Dr. Mark Blair made a provisional diagnosis of Bipolar Disorder, "most recent episode depressed, severe with psychotic features." (Hrg. Tr., p. 82; MCI records, Def. Ex. M, p. 5037-5041.) Dr. Blair continued Zyprexa and increased the dosage of Lamictal "to further address [Appellant's] symptoms of Bipolar Depression." (*Id.* at p. 5040.) Appellant was placed on the psychiatric outpatient caseload and classified as "Cl Categorial (SMI [serious mental illness])" based on his Bipolar Disorder diagnosis. (Hrg. Tr., p. 85; MCI records, Ex. M, Appx. 5040, 5053.)

{¶41} Roughly three years later, on February 15, 2008, Appellant was reported to have "rapidly decompensated with prominent paranoid psychosis," and he was transferred to the psychiatric hospital unit at Oakwood Correctional Facility ("Oakwood"). (Oakwood records, Ex. N, Appx., p. 4764; Hrg. Tr., p. 91-92.) In the months before his admission to Oakwood, Appellant had asked that his psychotropic medications be discontinued because of the side effects. (Oakwood records, p. 4764.) Appellant then began hearing correctional officers and inmates "whispering and talking about him and threatening to harm him in various ways." (*Id.* at p. 4766.) Appellant reported hearing voices since childhood.

{¶42} MCI staff "indicate[d] that [Appellant] was obviously quite paranoid and delusional. He refused to eat or take his medications because of his paranoid delusions." (*Id.*) Even after Appellant was moved to protective custody, away from the others who were "threatening" him, "he continued to deteriorate." (*Id.* at p. 4765.)

{¶43} Prior to the cessation of Appellant's psychotropic medication, ODRC reports reflect he "had apparently done fairly well in prison. Appellant reported good relationships with staff and other inmates. He had no significant conduct problems prior to the very recent psychotic decompensation." (*Id.* at p. 4766.)

{¶44} Upon admittance to Oakwood, doctors prescribed Lamictal (mood stabilizer), Buspar (antidepressant), and Risperdal (antipsychotic). (*Id.* at p. 4767.) The dosage of Risperdal was gradually increased, and Cogentin (prescribed to address stiffness and tremors associated with Parkinson's disease) was added to treat the associated side effects of antipsychotics. (*Id.* at p. 4767; Hrg. Tr. 96.) ODRC staff noted "with the increased Risperdal patient did finally start to show some improvement with significantly less paranoia and a reduction in the voices." (Oakwood records, p. 4767.)

After Appellant developed a rash and swelling attributed to Lamictal, he was prescribed another mood stabilizer, Depakene, with the dosage gradually increased over time. (*Id.*)

**{¶45}** When Appellant's medications were stabilized, Appellant reported he was "feeling much better and was eager to return to his parent institution," and "the whispering he heard before seems to have stopped or is easily ignored." (*Id.* at p. 4767.) In recommending Appellant's return to MCI, Dr. Glennard S. Ruesdisueli observed, "[Appellant] is aware that he had significant problems and the medications are helpful to him. It is unclear if he truly recognizes that his paranoia is related to his illness. He is however fully cooperative with this treatment." (*Id.*) In Appellant's discharge narrative summary from Oakwood, Dr. Ruesdisueli provided a diagnosis of Paranoid Schizophrenia. (*Id.*)

**{¶46}** In the years following Appellant's hospitalization at Oakwood, Schizoaffective Disorder has been his primary diagnosis. (Hrg. Tr., p. 99, 102; MCI records, Def. Ex. 0, Appx. 2037.) Appellant has been retained at the highest level of mental health caseload (C1) throughout his entire incarceration. (Hrg. Tr., p. 103.) He has remained on psychotropic medications, most recently taking Vistaril for anxiety, and Loxapine, an antipsychotic medication. (Hrg. Tr., p. 102-103.)

**{¶47}** Since his release from Oakwood, ODRC employees report Appellant has been compliant with his medication. (Hrg. Tr., p. 98, 102.) There have been no concerns noted that Appellant may be malingering, despite considerable scrutiny by prison staff because of the known "potential for secondary gain." (*Id.* at p. 279-280.)

**{¶48}** The progression of Appellant's mental illness from Bipolar Disorder to Schizoaffective Disorder is a recognized phenomenon. According to the DSM-5-TR, distinguishing Schizoaffective Disorder from Schizophrenia and from depressive and bipolar disorders with psychotic features is often difficult because the relative proportion of mood to psychotic symptoms may change over time, the appropriate diagnosis may change from and to schizoaffective disorder. (DSM 5-TR, p. 165.) Mosnik explained, "when there [is] a very significant exacerbation of symptoms and that psychotic symptoms [are] greater in intensity and severity and length of time relative to the mood symptoms," it is appropriate to change his diagnosis to Schizoaffective Disorder. (Hrg. Tr., p. 35.)

{¶49} Mosnik opined the evaluation and diagnoses of a mental illness requires a holistic, longitudinal view of all of the available evidence. Specifically, she testified, "[e]ach piece of information in isolation doesn't bring you to a conclusion whether there's a diagnosis" and a forensic examiner should "look at all possible interpretations of each piece of information . . . taken in the context in which it's presented." (*Id.* at p. 135.)

{¶50} Mosnik predicated her conclusion that Appellant was "diagnosed" with Bipolar Disorder and Schizoaffective Disorder on the longitudinal evidence in the record. She explained the different diagnoses (Borderline Personality Disorder, Intermittent Explosive Disorder, Bipolar Disorder, Schizoaffective Disorder) reflect a snapshot in time, but the forensic diagnosis at issue in the SMI petition requires an analysis of the different diagnoses, the expected progression of the disorders, and responses to different treatments and medications. (*Id.* at p. 519.) Mosnik cautioned an examiner should not "cherry-pick" and "choose only certain symptoms" to consider, but consider the entire profile. (*Id.* at p. 137, 253.) She further cautioned records of self-reported information should be considered in the context of the manner in which trained professionals observed, recorded, and interpreted that information at the time.

{¶51} As a clinical and forensic neuropsychologist, Mosnik created a neuropsychological profile and compared it with the profiles of other people with Bipolar Disorder and Schizoaffective Disorder. Mosnik explained this information is particularly valuable because "[t]he neuropsychological profile in Bipolar Disorder and Schizoaffective Disorder remains present in between episodes and in between acute exacerbations of the illness and are present in both Schizoaffective and Bipolar Disorder patients who are clinically stable." (Hrg. Tr., p. 41.)

{¶52} According to Mosnik, when a person "has been treated pharmacologically and [is] clinically stable, there are still mood and low level sub-clinical psychotic symptoms and the cognitive symptoms remain present." (*Id.* at p. 41, 52.) Because the cognitive profile remains consistent in patients over time, the presence of these specific cognitive impairments and deficits provides relevant, objective data about a person's mental state throughout the course of their illness-rather than being a measurement of cognitive functioning limited to the time of testing.

Case No. 25 NO 0525

{¶53} Mosnik performed objective testing to assess Appellant's neuropsychological profile. (Hrg. Tr., p. 39, 42.) She testified the resulting data "show[s] the profile expected if [Appellant] had a genuine diagnosis of Bipolar or Schizoaffective Disorder." (*Id.* at p. 42.) According to Mosnik, the specific deficits associated with Bipolar and Schizoaffective Disorder that appear in Appellant's profile include:

- specific deficits on tests of executive functioning, specifically a test of inhibitory control;
- severe impairment in complex novel problem solving;
- deficits in verbal learning and memory; and
- deficits on tests of social cognition and social problem solving, with the most prominent deficits being in his ability to make inferences regarding social situations and social problem solving and interpreting perspective of others in social situations.

(*Id.* at p. 40-43.) Mosnik further testified this profile is not consistent with the profile seen after mild traumatic brain injury, but "is consistent with the research of Bipolar Disorder and Schizoaffective Disorder." (*Id.* at p. 157.)

{¶54} Moreover, Appellant scored in the normal to above average range in visual facial memory, and in the normal range in the card sort test, which are both consistent with the Bipolar and Schizoaffective profile, and an indication that he was putting forth appropriate effort in the testing. (*Id.* at p. 42.) The embedded malingering measures in the tests of verbal learning and memory were also intact, so there was "no indication of suboptimal effort." (*Id.* at p. 43.) Mosnik ruled out malingering during her testimony. (*Id.* at p. 279.)

{¶55} Beyond Appellant's symptomology and neuropsychological profile, Mosnik testified other collateral information supports Appellant's serious mental health diagnoses. Appellant's social history included trauma and abuse, which is a risk factor for developing a serious mental illness. (*Id.* at p.106, 123.) Mosnik explained documented research has shown that "the greater number of types of trauma that you experienced in childhood is directly related to the development of serious mental illness, including Bipolar Disorder and Schizoaffective Disorder." (*Id.* at p. 45.) While a history of abuse and trauma

"doesn't say definitely that somebody's going to have [a serious mental illness] . . . the odds are significantly increased." (*Id.* at p. 124.) Mosnik opined, "[i]t's another piece of the puzzle . . . another piece of information that is relevant to consider." (*Id.*)

**{¶56}** Mosnik noted Appellant had a beneficial response to antipsychotic and mood stabilizing drugs, which "informs [the] diagnostic opinion." (Hrg. Tr., p. 35, 52, 280, 519.) Prison records reflect Appellant's symptoms were controlled or alleviated when he was compliant with his medication. Moreover, when Appellant asked to discontinue his psychotropic medications due to side effects, his mental state decompensated to the point that psychiatric hospitalization was required.

**{¶57}** Mosnik also explained how "profile course" also helps to determine whether someone is malingering. (*Id.* at p. 519.) Looking at whether the course of the mental illness is consistent with objective data, such as results of neuropsychological testing, can help "assess the veracity and genuineness of the presentation of symptoms." (*Id.* at p. 39.) When Mosnik examined the continuum of Appellant's symptoms and responses to treatment, she found that "the symptom presentation and the time frame of the symptoms exhibited by Appellant . . . is consistent with a Bipolar diagnosis and then ultimately a Schizoaffective diagnosis." (*Id.* at p. 35-36.)

**{¶58}** Adkins, on the other hand, opined Appellant "was not exhibiting acute symptoms of a qualifying Serious Mental Illness (SMI) at the time of the offense." (2/6/2024 Adkins Report, p. 14.) Adkins further opined Appellant's pre-offense diagnosis of Bipolar Disorder was invalid based on the fact that Appellant had not been hospitalized from 1996 to 2004 despite his numerous diagnoses. Adkins summarily attributed all of Appellant's self-reported symptoms to "his attempt to gain [disability benefits.]" (*Id.*) Adkins also relied on four years when Appellant was not receiving mental health treatment, 1999 to 2003, and was working as a State Tested Nursing Assistant ("STNA"). According to Appellant, he left employment due to his irritation with the residents. According to Adkins, he was terminated due to his failure to comply with the attendance rules.

**{¶59}** Adkins opined Appellant was not "acutely psychotic or symptomatic" at the time of the offense. (*Id.* at p. 16.) Although Adkins conceded Appellant had been diagnosed with "a brain injury (etiology unknown) that allegedly results in impairments in

his judgment and self-control," she cites Appellant's plasma donation and M.H.'s decision to commit the children to his care as evidence he was not exhibiting any acute psychosis or elevated or labile mood. (*Id.* at p. 15.) Finally, Adkins cites Appellant's interaction with law enforcement after the offense, where no mood disturbance was documented, and the exculpatory statements he provided to law enforcement regarding his commission of his crimes.

**{¶60}** Notably, Adkins' misstated the SMI standard in her expert report. Adkins cited the reason for her referral was to offer an opinion on "whether [Appellant] had a qualifying Serious Mental Illness (SMI) which significantly impaired his capacity to exercise rational judgment in relation to his conduct with respect to the crime," rather than, to exercise rational judgment with respect to conforming his conduct to the requirements of the law. (Adkins Report, Appx., p. 1.)

**{¶61}** Lending credence to Appellant's argument regarding the SMI trial court's conflation of the SMI standard and the NGRI standard, Adkins consistently testified during the hearing that Appellant was not "acutely psychotic" when he committed the offense. Similarly, her testimony at the hearing on the SMI petition focused on her opinion that Appellant was neither delusional (a false, fixed belief) nor experiencing hallucinations (auditory, visual, olfactory, or tactile) when he murdered B.H. For instance, Adkins testified that at the time of the offense "there was no indication that [Appellant] had an SMI of a psychotic nature and that's relevant in looking at the progression up until the time of the offense." (Hrg. Tr., p. 348.) Adkins further cites evidence in the record establishing Appellant did not report any hallucinations in the one year and four months following the offense.

**{¶62}** In addition to finding no credence in Appellant's pre-offense diagnoses due to malingering, Adkins also refused to recognize the validity of his current diagnosis of Schizoaffective Disorder. Adkins discounted the opinions of Appellant's treating physicians that Appellant was experiencing paranoid delusions that inmates and staff were planning to cause him harm in 2008. She reasoned pedophiles are often targets of inmates and staff in the prison system.

**{¶63}** Adkins further opined, "[Appellant] has not demonstrated – as I said, there's not been any additional episodes, there's not been any other documented issues with him

decompensating, any of those things. And when I met him he didn't report or endorse symptoms." (*Id.* at p. 465.)   She continued, "[p]erhaps he's on the correct medicine; perhaps he is one of the first people ever to have been given the right medication and magically never had another symptom.  That's fairly uncommon for someone to have an incident, they get on the right medicine and there's never another incident." (*Id.* at p. 462.) Adkins' opinion ignores the fact that Appellant's medications had been adjusted since 2003, and his psychotic break in 2008 was attributed by his treating physicians to his decision to discontinue his antipsychotic medication due to the side effects.

## C. <u>THE SMI TRIAL COURT'S MARCH 14, 2025 JUDGMENT ENTRY</u>

{¶64} In the March 14, 2025 judgment entry, the SMI trial court concludes Appellant failed to show he suffered from Bipolar Disorder prior to the offense (division (A)(1) and (B)), and in the alternative, Appellant's Bipolar Disorder and/or Schizoaffective Disorder did not significantly impair his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct when he committed the offense (division (A)(2)).  With respect to division (A)(1) of the SMI statute, the SMI trial court rejects the diagnoses Appellant received at CMHS, including Melhem's 2003-2004 Bipolar diagnosis, because they rested on Appellant's self-reported history and his labile behaviors observed over three interviews that lasted a total of one hour and forty minutes.

{¶65} In finding Appellant did not suffer from Bipolar Disorder, the SMI trial court also cites Appellant's history of malingering in order to acquire disability benefits. According to the SMI trial court, the forensic evidence (that is, the evidence surrounding Appellant's respective diagnoses) presents a "clear portrait" that Appellant engaged in "deliberately deceptive and manipulative and malingering behaviors." (FF/CL, p. 19)  The SMI trial court finds Appellant has a "complete lack of veracity and credibility when self-reporting symptoms throughout his adult life." The SMI trial court further finds "the forensic record has seriously impeached [Appellant's] character (his propensity for lack of veracity and credibility.)"  (*Id*. at p. 46.)

{¶66} The SMI trial court also cites Appellant's 1995 application for Social Security disability to conclude he was a serial malingerer. Although Appellant scored poorly on IQ

tests administered for the 1995 Social Security determination of disability (49), his IQ testing before the age of 18 showed much higher IQ scores (between 78 and 85). The SMI trial court cites the testimony of the state's intellectual disability expert at the criminal trial (Ott), who explained seven of Appellant's childhood and adolescent IQ scores were higher than would be expected with a person with a severe intellectual disability. Moreover, Ott observed the low IQ scores obtained by Appellant under 1995 Social Security testing were consistent with profoundly intellectually disabled persons whose abilities and behaviors were far more diminished when compared to the abilities and behaviors displayed by Appellant.

**{¶67}** Appellant's social security benefits based on his intellectual deficits were terminated in 2003 because he was earning disqualifying income from a welding job. On September 30, 2003, Appellant filed a form captioned "Reinstatement Request Title II," seeking reinstatement of his social security disability benefits.

**{¶68}** At oral argument, Appellant's counsel argued he sought reinstatement of his benefits related exclusively to his intellectual deficits. The state conceded the same. The state's concession was surprising as Adkins and the SMI trial court rely in large measure on Appellant's alleged play-acting regarding his psychological problems, for the exclusive purpose of fraudulently resuming his disability benefits, to conclude Appellant did not have a diagnosis of Bipolar Disorder or Schizoaffective Disorder.

**{¶69}** However, our review of the Report of Continuing Disability Interview, filed on October 3, 2003 in conjunction with Appellant's reinstatement request, reveals Appellant reported he "get shakes a lot," and cited a "temper problem," mental retardation, asthma, and back pain as reasons for reinstatement of his benefits. Significantly, the report reads in relevant part:

> Am limited on what can do [sic] and I get irritated so I stay away from children. The more I am around people the more irritated I get, I get so upset that I even have to relieve stress. Johnny around irritates me and don't [sic] see no sense in it and get irritated [illegible] and feel like I need to destroy the source.

(Social Security Records 2003, 9/30/2003 Report of Continuing Disability Interview, Bates stamp, p. 7.)

**{¶70}** Moreover, the report reads Appellant stopped driving due to his irritation with other motorists, in addition to many other sources of extreme irritation, including pets, haircuts, listening to the radio, and watching television. Appellant states he was previously prescribed Ritalin "and also medication for [his] temper." (*Id.,* Bates stamp, p. 10.) He explains "[p]sychiatrists things [sic] part of my stressful problems are due to a build up anger from the past, have had to live with seeing my mother being beaten. I am not afraid of getting hurt, I am just afraid of hurting someone else." (*Id.,* Bates stamp*,* p. 11.)

**{¶71}** The SMI trial court characterizes Appellant's application to reinstate his disability benefits as "deliberately false" and opines Appellant had an "intentional plan to malinger to obtain SSI benefits for a psychiatric disorder in October 2003. . . ." (FF/CL at p. 59.) The SMI trial court cites M.H.'s testimony at the competency hearing, in which she averred Appellant had deliberately feigned adverse mental health symptoms at CMHS when he reapplied for social security benefits in December of 2003.

**{¶72}** Both M.H. and Anderson (Appellant's ex-wife) testified at the competency hearing that Appellant had been coached by his stepmother to feign mental health problems. According to M.H.'s testimony at the competency hearing, Appellant planned to resume mental health treatment in 2003 and his goal was to be admitted to a mental hospital for a week in order to ensure the restoration of his benefits. (10/06/04 Competency Hrg., p. 182.)

**{¶73}** Appellant told M.H. that when he was evaluated by mental health personnel, he "just sat there, didn't say a word." Appellant told M.H. that if the mental health personnel touched him, he would "let out a scream." (*Id.* at p. 185, 188-189.)

**{¶74}** According to M.H's testimony, Appellant suggested she should fraudulently apply for benefits as well. Among his recommendations, Appellant instructed M.H. to consistently ask treating physicians to increase the dosage of prescribed medication. (*Id.* at p. 179.) M.H. claimed she refused to submit a fraudulent application for benefits because she is an honest person.

Case No. 25 NO 0525

**{¶75}** Significantly, the CMHS records do not substantiate M.H.'s testimony. There is no evidence in the CMHS records that Appellant refused to answer questions or shouted if he was touched.

**{¶76}** Further, M.H. testified during her direct testimony at the competency hearing that Appellant assisted the children with their homework, including "help[ing] them spell the names of words." (*Id*. at p. 183.) On cross examination, M.H. conceded she assisted Appellant in completing his social security applications because Appellant "said he had trouble with writing and spelling words and stuff," and had trouble reading too "if it was a long word." (*Id*. at p. 190.)

**{¶77}** Finally, M.H. averred that many of the facts stated in the report (for instance, that Appellant requires assistance to complete his activities of daily living) were fabrications. She reluctantly conceded on cross-examination that she participated in Appellant's alleged fraud when she recounted the alleged falsities in the social security application on his behalf.

**{¶78}** Nonetheless, the SMI trial court characterizes the foregoing competency hearing testimony as "absolutely stunning," and concludes it "significantly impact[ed]" the Bipolar Disorder diagnosis made by Bowman and Melhem. (FF/CL, p. 21-22.) According to the SMI trial court, Appellant's pattern of malingering on his second social security application taints Appellant's credibility in describing his mental health symptoms to Bowman and Melhem during the three visits by Appellant at CMHS from 2003 to 2004. The SMI trial court opines:

> [T]he previously admitted forensic evidence [showed] [Appellant's] prior malingering, suspicious and questionable I.Q. test results to obtain SSD, as an adult, his knowledge of "how to game" the mental health system, his prior deliberately deceptive application to reinstate his SSD based upon false representations, and [Appellant's] admission to [M.H.] as to how he intended to act when he encountered a mental health provider, all of which perfectly mirrored his self-reported symptoms and his office interview behaviors and demeanors when examined by [Melhem] and [Bowman], and which were unknown to them at the time.

Case No. 25 NO 0525

(*Id*. at p. 29.)

{¶79} Consistent with Adkins' testimony, the SMI trial court opines the CMHS records demonstrate Appellant's history of mental health behavior has been provided entirely by Appellant alone (self-reporting), and the history Appellant provided to Melhem was motivated by his desire to resume social security benefits. The SMI trial court writes, Appellant represented "he was incapable of caring for himself in his SSI application, when, in fact, he was donating blood, lifting weights, and caring for his children in the preceding days up to and during the time of his crimes." (*Id.* at p. 36-37, Appx. 431-432.)

{¶80} With respect to Appellant's behavior during mental health evaluations, the SMI trial court concludes McPherson's testimony "also corroborates [Appellant's] complete lack of credibility and veracity when self-reporting his over-exaggerated symptoms." (*Id*. at p. 23.) The SMI trial court relies on McPherson's testimony that "[Appellant] is not a good historian and tends to respond out of whatever is effective at the moment" and she could not treat Appellant's subjective statements as factually accurate." (*Id.* at. p. 36.)

{¶81} Further, the SMI trial court concurs with McPherson's mitigation phase trial testimony that Appellant "was clearly overstating pathology on the Minnesota Multiphasic Personality Inventory ("MMPI 2"). McPherson testified Appellant was "presenting as if floridly mentally ill and he's not floridly mentally ill." She further testified Appellant was prone to endorse most symptoms that he happened to recognize would indicate mental illness." (Mit. Hrg. Tr., p. 5875.)

{¶82} However, McPherson provided the following analysis of the effect of Appellant's childhood abuse at the mitigation hearing:

He – under threat, he tends to deal with the world by narrowing perception. . . . One way to deal with a hostile environment is to not see it.

. . .

And that's a fairly characteristic way for him to operate. [He] doesn't process – perhaps the other thing that was of substantial importance is he doesn't process emotion. He doesn't – doesn't respond to it, he doesn't

give evidence of it. I see this in the interview, but I also see this clearly in the [MMPI 2], as well.

. . .

He is not psychotic. If there is something in his way, he goes around it. He's not misperceiving the world, but he's not responding to it emotionally.

One thing we know about people who have suffered early abuse is that one way they learn to cope is by ending their emotional responding. We also know that some people are born with less capacity for emotional response than others. He seems particularly devoid of emotional reactivity and of an appreciation of emotions in others.

(*Id.* at p. 5890-5892.)

{¶83} McPherson continued:

[Appellant] does not have the capacity to identify with the pain of another in the same degree that may be – that certainly those of us who have been lucky enough to grow up with an intact situation or a relatively intact situation have.

And so, you know, in some ways [Appellant's] existence is described in the literature, as-if existence. He behaves as if he is like the rest of us and he is not like the rest of us.

(*Id.* at p. 5909-5910.)

{¶84} McPherson opined Appellant, who was victimized in his own domestic situation as a child, was only a threat in domestic situations as an adult. She explained, "[h]e is dangerous if he is in a domestic context because he won't manage the territory and he will do something stupid and something terrible at times." (*Id.* at p. 5915-5916.)

{¶85} Finally, McPherson explained the commission of the offense as follows:

So, under conditions of high arousal, when you're frightened, when you know you have done something terribly wrong, something that will be terribly punished and you're heightened, you tend, even if you are, a normal person, to move to a high stress state, which is a narrow state.

. . .

So that kind of primitive thinking would be characteristic of anybody in a high arousal state. In his case even more so because he goes through life that way.

His – he was moving about in the environment, looking for some way to cope with this situation, including whatever first came to mind, or was first presented to his consciousness, and that's why he does what he does.

. . .

If he thinks about it, he might be seriously in trouble for rape and, indeed, he would be. He wouldn't be in this much trouble. But he does not think, he just reacts.

(*Id.* at p. 5913-5915.)

**{¶86}** The SMI trial court finds Appellant's condition was more appropriately diagnosed by McPherson as Borderline Personality Disorder. However, McPherson conceded at the mitigation hearing "[b]ipolar affective disorder and borderline personality disorder happen to overlap substantially. There's a lot of literature about that. There's room for diagnostic equivocation between professionals, but we're probably seeing the same thing." (*Id*. at p. 5880.)

**{¶87}** Even assuming Appellant had been diagnosed with a qualifying condition, the SMI trial court concludes in the alternative there was no evidence the qualifying condition significantly impaired Appellant's capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct at the time of the offense. The SMI

trial court opines there was "no direct or circumstantial forensic evidence of a manic episode (Bipolar I) [or] . . . a Hypomanic Episode (Bipolar II)." (FF/CL, p. 62.)   The SMI trial court concludes:

> During the entire eighteen (18) consecutive day period [prior to the offense], except for [Appellant's] version of his crimes, there is absolutely no direct or circumstantial evidence, in any previously admitted forensic record, as to the common features of Depressive Disorders (sadness, emptiness, irritable mood, accompanied by somatic and cognitive changes that would significantly impair his capacity to exercise rational judgment.[)]

(*Id.* at p. 62-63, citing DSM-5 definitions.)

{¶88} The SMI trial court further finds "crime-contemporaneous information considered by [Adkins] in her report . . . is otherwise relevant, material, probative forensic evidence to establish the necessary threshold upon which [to] infer the extent of [Appellant's] cognitive functioning before and at the time of his crimes. (*Id.*)  Specifically, the SMI trial court opines:

> Even if [Appellant's] veracity as to the commission of his crimes may have improved after serving twenty (20) years in prison, the forensic record herein cannot be re-habilitated to refute his knowing and purposeful malingering throughout his life, his ever-changing version as to how his crimes occurred, his various reports of a reasoning process ("I need time to think") to [Heiden], [McPherson], and [Adkins], all of which contradicts his reporting to Mosnik twenty years thereafter.

(*Id.* at p. 64.)

{¶89}  This timely appeal of the SMI trial court's ruling on Appellant's SMI petition followed.

<u>**ANALYSIS**</u>

**{¶90}** Appellant's assignments of error are taken out of order and grouped together for ease of analysis.

<u>**ASSIGNMENT OF ERROR NO. 1**</u>

**THE [SMI] TRIAL COURT ERRED WHEN IT INVENTED ITS OWN INCORRECT SMI STANDARD. R.C. 2929.025; OHIO CONST. ARTICLE 1, SEC. 16; U.S. CONST. AMEND V, XVI.**

<u>**ASSIGNMENT OF ERROR NO. 3**</u>

**THE [SMI] TRIAL COURT ERRED IN DENYING [APPELLANT'S] SMI PETITION.  R.C. 2929.025; OHIO CONST., ARTICLE 1, SEC. 9; U.S. CONST. AMEND VIII.**

**{¶91}** We review the trial court's judgment entry dismissing a petition for postconviction relief for an abuse of discretion.  *State v. Dixon*, 2013-Ohio-2951, ¶ 21 (7th Dist.). An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

**{¶92}** The Ohio Supreme Court summarized the abuse of discretion standard to be applied in postconviction appeals in *State v.* Weaver, 2022-Ohio-4371, as follows:

> In [*State v. Gondor*, 2006-Ohio-6679], this court plainly rejected a court of appeals' application of de novo review in reversing a trial court's postconviction-relief findings and held that abuse of discretion is the proper standard for reviewing such findings. *Id.* at ¶ 58. We explained that the term "abuse of discretion" connotes that " 'the court's attitude is unreasonable, arbitrary or unconscionable.' " *Id.* at ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Stated differently, an abuse of discretion involves more than a difference in opinion: the " 'term discretion itself involves the idea of choice, of an exercise of the will, of a determination

<u>Case No. 25 NO 0525</u>

made between competing considerations.' " *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984), quoting *Spalding v. Spalding*, 355 Mich. 382, 384, 94 N.W.2d 810 (1959). For a court of appeals to reach an abuse-of-discretion determination, the trial court's judgment must be so profoundly and wholly violative of fact and reason that " 'it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.' " *Id.*, quoting *Spalding* at 384-385, 94 N.W.2d 810.

*Id.* at ¶ 24.

**{¶93}** We are cognizant that the preponderance standard is merely proof which leads the trial court to find that " 'the existence of the contested fact is more probable than its nonexistence.' " *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987), quoting McCormick, *Evidence,* § 339, at 957 (3 Ed. Cleary Ed. 1984). A preponderance of the evidence means the greater weight of the evidence, which may be infinitesimal as it need only destroy the equilibrium. *Id*., citing *Travelers' Ins. Co v. Gath*, 118 Ohio St. 257, 261 (1928).

**{¶94}** "Although an appellate court must not reweigh the witness testimony when reviewing a trial court's credibility determination, that *does not* mean it may skip reviewing a court's credibility determination of a witness in the name of deference." (Emphasis in original) *Weaver*, 2022-Ohio-4371, at ¶ 35. A reviewing court may consider the factors (i.e., immaterial information, a fundamental misunderstanding of fact or law, bias) upon which the trial court relied to discredit expert testimony. *Id*.

**{¶95}** Moreover, "courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule." *Johnson,* 2021-Ohio-3304, at ¶ 39. Further, "[a]n abuse of discretion may be found when the trial court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Corey v. Corey*, 2021-Ohio-1288, ¶ 12 (7th Dist.).

**{¶96}** With respect to division (A)(1) of the SMI statute, Appellant contends the SMI trial court relied on language from the DSM-5 to significantly increase the evidentiary burden of division (A)(1) from a clinical diagnosis of a qualifying condition to a forensic

diagnosis of a qualifying condition. The SMI trial court observes in the March 14, 2025 judgment entry that a "forensic diagnosis" requires more than a "clinical diagnosis," (J.E., p. 4.), and the pre-offense Bipolar Disorder diagnoses were not "validated," which is essential to a forensic diagnosis. *Id.* at p. 11-12.

{¶97} Both Mosnik and Adkins explained the distinction between a clinical diagnosis and a forensic diagnosis during their testimony. According to Mosnik, the goal of a clinical diagnosis is to treat the patient, while a forensic diagnosis is intended to assess the impact of a defendant's mental illness on his commission of a crime or ability to assist in his own defense. Adkins explained a clinical psychologist focuses on the individual and the effect of his diagnosis on his functioning, but "[w]ith forensics, it is specifically looking at the intersection between psychology and the law." (Hrg. Tr., p. 299.)

{¶98} In invalidating Melham's 2003-2004 Bipolar Disorder diagnosis, the SMI trial court cites the DSM-5 for the proposition that "[u]nless incontrovertible etiological or pathophysiological mechanisms are identified to fully validate specific disorders or disorder spectra, the most important standard for the DSM-5 disorder criteria will be their clinical utility. (DSM-5, p. 20)." (J.E., p. 29.) The full quote from the DSM-5 reads, "[u]nless incontrovertible etiological or pathophysiological mechanisms are identified to fully validate specific disorders or disorder spectra, the most important standard for the DSM-5 disorder criteria will be their clinical utility for the clinical course and treatment response of individuals grouped by a given set of diagnostic criteria." (DSM-5, p. 20). The SMI trial court further quotes the DSM-5 for the proposition that "[a]dditional information is usually required beyond that contained in the DSM-5 diagnostic criteria in order to make legal judgments on such issues as criminal responsibility . . . and competency." (J.E., p. 29.)

{¶99} The cautionary statement of the DSM-5 reads that a clinical diagnosis of a DMS-5 mental disorder does not imply that an individual meets the legal criteria for the presence of a mental disorder or a specified legal standard. The DSM-5 reads, in relevant part:

> For the latter, additional information is usually required beyond that contained in the DSM-5 diagnosis, which might include information about the individual's functional impairments and how these impairments affect

the particular abilities in question.  It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment or disability.

(DSM-5, p. 25.)

{¶100} Although the SMI trial court concedes Melhem "provided a clinical diagnosis of Bipolar NOS, Mixed," (FF/CL, p. 16), it later asserts Melhem's clinical diagnosis "fail[ed] to validate a specific disorder or disorder spectra because each diagnosis fails to address the required DSM-5 criteria to validate specific disorder." (*Id.* at 28.)  The SMI trial court further opines Melhem's diagnosis was "not based on the necessary forensic facts that this Court must consider to determine a validated diagnosis of Bipolar Disorder in accord with DSM-5 requirements." (*Id.* at p. 28-29); *see also* p. 59 ("Melhem's 'good-faith' clinical diagnosis of Bipolar is not a validated diagnosis in accord with the necessary requirements set forth in DSM-5"). Relying on the DSM-5, the trial court concludes a clinical diagnosis is insufficient to satisfy division (A)(1) of the SMI statute.

{¶101} To the contrary, we find the plain language of division (A)(1), which requires proof by a preponderance of the evidence of a diagnosis of a qualifying condition, refers to a clinical diagnosis.  Mosnik and Adkins agreed that a clinical diagnosis relates to the treatment of the disorder, while a forensic diagnosis establishes the relationship between the clinical diagnosis and the commission of the offense.  In other words, the forensic diagnosis is relevant to division (A)(2), where a petitioner must demonstrate his qualifying condition significantly impaired his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law when he committed the offense.  Accordingly, we find the SMI trial court erred as a matter of law in concluding a forensic diagnosis must be established by a preponderance of the evidence to satisfy the evidentiary burden of division (A)(1) of the SMI statute.

{¶102} Because a clinical diagnosis of a qualifying condition is sufficient to satisfy the evidentiary requirement of division (A)(1) of the SMI statute, we further find Appellant's Schizoaffective Disorder diagnosis in 2008 constitutes a diagnosis of a qualifying

Case No. 25 NO 0525

condition at any time prior to or after the offense. Even assuming arguendo that Appellant's 2008 diagnosis is too far removed from the offense, we find the SMI trial court acted arbitrarily in relying exclusively on evidence of Appellant's malingering to conclude the pre-offense Bipolar Disorder diagnoses were invalid. Appellant was consistently diagnosed and treated for Bipolar Disorder then Schizoaffective Disorder from his earliest treatment at CMHS in 1996 through his incarceration to the present day.

{¶103} Moreover, the SMI trial court imposed an unwarranted temporal limitation on Appellant's 2008 diagnosis of Paranoid Schizophrenia at Oakwood by limiting the qualifying diagnosis to February 15, 2008 to March 12, 2008. The SMI trial court relied on Ruedisueli's Axis IV diagnosis (psychosocial and environmental problems) of "[s]evere psychosocial stressors related to incarceration on death row," to conclude the diagnosis was unrelated to Appellant's pre-offense Bipolar Disorder diagnoses. (J.E., p. 44.) In other words, the SMI trial court marginalized Appellant's 2008 Paranoid Schizophrenia diagnosis, and ignored the fact that Appellant was prescribed antipsychotic medication and retained at the highest level of the prison's mental health caseload throughout his incarceration, both before and after his psychotic break. The SMI trial court concedes its failure to consider Appellant's 2008 Paranoid Schizophrenia diagnosis or his current Schizoaffective Disorder diagnosis, writing, "[Appellant] has failed to prove, by a preponderance of all *forensic* evidence admitted herein, that he has been diagnosed with a 'serious mental illness', prior to, and/or at, or about the time of his crimes. . ." (*Id*. at p. 6.)

{¶104} The state contends the SMI trial court correctly rejected Appellant's pre-offense Bipolar Disorder diagnoses based on Appellant's overstatement of his symptoms in an effort to acquire social security benefits and Melhem's failure to confirm his symptoms with his family members. In the state's two-page analysis of the third assignment of error (the merits challenge), the state argues there is ample evidence of Appellant's malingering, which Mosnik patently ignored. However, the diagnoses subsequent to Appellant's arrest confirm the original diagnosis for the purpose of division (A)(1) and (2) of the SMI statute.

{¶105} Accordingly, we find the SMI trial court erred as a matter of law when it interpreted division (A)(1) of the SMI statute to require a forensic diagnosis of a qualifying

condition. We further find the SMI trial court abused its discretion when it relied solely on Appellant's malingering to conclude Appellant was not "diagnosed" with a qualifying condition as required by division (A)(1) of the SMI statute. Finally, we find Appellant has demonstrated by a preponderance of the evidence that he was diagnosed with Bipolar Disorder prior to the offense, and Bipolar Disorder and Schizoaffective Disorder after the offense. Therefore, we reverse the SMI trial court's decision with respect to division (A)(1) of the SMI statute.

{¶106} With respect to division (A)(2), which also requires proof by a preponderance of the evidence, Appellant contends the SMI trial court conflated the standards applicable in the various forensic assessments of a criminal defendant's mental health. More pointedly, Appellant argues the SMI trial court applied a mix of NGRI and competency standards, rather than the lesser standard fashioned by the legislature in the SMI statute. As previously stated, the majority of Adkins' testimony established Appellant was not acutely psychotic when he committed the offense. The remainder of Adkins' testimony was offered to establish Appellant was overstating his intellectual deficits with respect to his first social security application, and overstating his mental illness with respect to his second social security application.

{¶107} With respect to the impact of Appellant's qualifying condition on the day of the offense, the state argues there is no testimony in the record that Appellant was behaving or functioning abnormally, based on his plasma donation in the morning and M.H.'s decision to leave the children in his care in the evening. The state further argues Appellant's conduct following the rape, that is, his post-rape efforts to conceal his crimes, is evidence that his capacity to exercise rational judgment in regards to both his ability to conform his conduct to the requirements of law and to appreciate the nature, consequences and wrongfulness of his conduct at the time the offense was committed were not significantly impaired by his serious mental illness.

{¶108} Mosnik opined Appellant described symptoms of Bipolar Disorder in the days prior to the offense, including racing thoughts, irritability, angry outbursts, difficulty sleeping, and labile mood. On the day of the offense, Appellant reported irritability, gastrointestinal upset, depression, and racing thoughts. (Hrg. Tr., p. 160-161.) Appellant discontinued his medication roughly one week before the offense due to side effects

including gastrointestinal upset. Further, Mosnik described Appellant's efforts to conceal the rape as "a very disorganized, ineffective attempt to do that and he is deficient in his ability to do that because of the symptoms of the serious mental illness that significantly impair his capacity to exercise rational judgment and to engage in behaviors that make sense, that are rational." (*Id.* at p. 168.)

**{¶109}** In determining Appellant's rational judgment was significantly impaired, Mosnik considered "things that happened prior to [the offense] that's documented in the record, information about what occurred on the day of the offense, at the time of the offense, and after the offense to the best of [her] ability as a forensic examiner, and consider[ed] and weigh[ed] all that information in the context of the statute." (Hrg. Tr., p. 172; 180.) For instance, Mosnik cited Appellant's explanation of the commission of the rape, that "there was no thought process, this just occurred, and then afterwards thinking everything was fine until he saw blood, some dishevel [sic] that maybe's she not alright." (*Id*. at p. 163*.*)

**{¶110}** Further, Mosnik testified Appellant's neuropsychological profile established he was impaired in areas such as "impulsivity and impaired inhibitory control, impaired decision making, and the entire neuro-psych profile of impaired executive functioning, cognitive problem solving, impaired social problem solving and emotional regulation." According to Mosnik, these impairments were "attributable to the serious mental illness of Bipolar Disorder that a person cannot control or shut off by themselves" and as "demonstrated in the research, [are] not treated by the medication and continue even in partially treated or clinically stable individuals." (*Id.* at p. 163-164.)

**{¶111}** Considering all the available evidence of Appellant's symptoms, neuropsychological profile, and the events before, during, and after the offense, Mosnik concluded to a reasonable degree of scientific certainty:

> That as a result of the serious mental illness with which [Appellant] was diagnosed prior to and at the time of the offense in an active phase of the illness, that he was significantly impaired in his capacity to exercise rational judgment in regards to both his ability to conform his conduct to the requirements of law and to appreciate the nature, the consequences and the wrongfulness of his conduct at the time the offenses were committed.

(*Id.* at p. 185.)

**{¶112}** Adkins, on the other hand, opined there was no evidence in the record that Appellant was symptomatic on the day of the offense or the days that followed. Adkins testified the record was devoid of evidence that Appellant was behaving or functioning abnormally during his plasma donation in the morning, or later that evening when M.H. entrusted the care of the children to Appellant.

**{¶113}** While Mosnik opined Appellant's post-rape conduct, that is, his efforts to conceal his crimes including the aggravated murder, were the product of his serious mental illness; Adkins opined Appellant's conduct was no different than any other criminal attempting to avoid arrest and conviction. Adkins further opined Appellant's post-rape conduct demonstrated Appellant's capacity to exercise rational judgment in regards to both his ability to conform his conduct to the requirements of law and to appreciate the nature, the consequences and the wrongfulness of his conduct at the time of the offense. Appellant hid B.H.'s body then convinced her family members that she was missing. Appellant participated in the subsequent search for B.H. Adkins opined Appellant's post-rape conduct demonstrates his thought process was clear and his actions were calculated to avoid detection.

**{¶114}** With respect to division (A)(2) of the SMI statute, the SMI trial court concludes Appellant's conduct both before and after the offense demonstrated he was not acutely psychotic when he committed the offense. The SMI trial court further finds Appellant's efforts to conceal his crime demonstrated Appellant's capacity to exercise rational judgment in regards to both his ability to conform his conduct to the requirements of law and to appreciate the nature, consequences and wrongfulness of his conduct at the time of the offense was not significantly impaired by his mental illness.

**{¶115}** In order to conclude the SMI trial court abused its discretion regarding division (A)(2) of the SMI statute, we must find the SMI trial court's judgment is so profoundly and wholly violative of fact and reason that it evidences a perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias. It is not enough that we would reach a different conclusion, or would not have found that reasoning process to be persuasive in view of countervailing reasoning processes that would support a contrary result.

Case No. 25 NO 0525

{¶116} Here, a factfinder could reach two competing reasonable conclusions regarding Appellant's post-rape conduct. According to Mosnik, Appellant's conduct demonstrates a frenzied, irrational campaign to avoid responsibility for his crimes, resulting from the significant impairment of his ability to conform his conduct to the requirements of the law. According to Adkins, Appellant's conduct establishes a calculated, rational, albeit poorly-conceived and executed campaign to avoid responsibility for his crimes, indistinguishable from the actions of scores of other defendants with no qualifying condition. Our standard of review requires deference to the trial court's interpretation in this circumstance. As the SMI trial court agreed with Adkins, the preponderance of the evidence establishes Appellant's capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciate the nature, consequences or wrongfulness of his conduct was not significantly impaired by his serious mental illness at the time of the offense. Accordingly, we affirm the trial court's dismissal of the SMI petition.

{¶117} In summary, we conclude the SMI trial court erred as a matter of law when it concluded a forensic diagnosis of a qualifying condition was required to satisfy the evidentiary burden of division (A)(1) of the SMI statute. We further find the SMI trial court abused its discretion when it relied to the exclusion of all other evidence on Appellant's malingering, as the preponderance of the evidence establishes Appellant suffers from a qualifying condition. Nonetheless, we affirm the SMI trial court's decision with respect division (A)(2) of the SMI statute, as we cannot conclude the trial court abused its discretion when it relied on Appellant's conduct on the day of the offense and in the days that followed to find Appellant's serious mental illness did not significantly impair his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciate the nature, consequences or wrongfulness of his conduct at the time of the offense. Given the SMI trial court's interpretation of the facts, the preponderance of the evidence establishes Appellant's capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciate the nature, consequences or wrongfulness of his conduct was not significantly impaired by his serious mental illness at the time of the offense. Accordingly, we find Appellant's first and third assignments of error have merit to the extent they are based on

Case No. 25 NO 0525

the SMI trial court's conclusion with respect to division (A)(1) of the SMI statute, but have no merit to the extent they are based on the SMI trial court's conclusion with respect to division (A)(2) of the SMI statute.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT IMPROPERLY RELIED ON TESTIMONY FROM THE VICTIM'S MOTHER IN A 2004 PRETRIAL HEARING TO DENY [APPELLANT'S] SMI PETITION, VIOLATING THE RULES OF EVIDENCE, [APPELLANT'S] SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM, AND [APPELLANT'S] FIFTH AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS.**

**{¶118}** Next, Appellant argues the SMI trial court relied on M.H.'s testimony at a "pretrial hearing in 2004," citing "Pretrial Hrg., Vol. III, p. 166-214," that Appellant encouraged M.H. to feign symptoms in order to acquire social security benefits. Appellant argues the pretrial hearing was not among the hearing transcripts admitted into evidence at the hearing on the SMI petition. The state counters the SMI trial court was required to consider all of the evidence in the record pursuant to the plain language of the SMI statute.

**{¶119}** However, the "pretrial hearing in 2004" is the competency hearing conducted on October 6, 2004. The SMI trial court cites the source of the foregoing testimony as the "evidentiary transcript of [Appellant's] Pre-Trial Competency Hearing, held on October 6, 2004, which included the previous testimony of Sarah Mundt, Dana Anderson [Appellant's ex-wife], John Mundt Jr., Jeff Stevens, [M.H.], and [Ott], and which testimony was previously admitted into evidence by the trial court." (J.E., p. 1.) M.H.'s testimony at the competency hearing is transcribed from pages 166-204.

**{¶120}** The March 14, 2025 judgment entry begins with a detailed list of the evidence admitted at the hearing on the SMI petition and includes the competency hearing. Accordingly, we find Appellant's second assignment of error has no merit, as the competency hearing transcript was admitted into evidence at the hearing on the SMI petition.

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRONEOUSLY DETERMINED THAT [MOSNIK'S] TESTIMONY WAS INADMISSIBLE. R. C. 2929.025; EVID. R. 702; OHIO CONST., ARTICLE 1, SEC. 16; U.S. CONST. AMEND V, XIV.**

## ASSIGNMENT OF ERROR NO. 5

**THE TRIAL COURT IMPERMISSIBLY SUBSTITUTED ITS OWN OPINIONS IN PLACE OF A QUALIFIED EXPERT IN VIOLATION OF *STATE V. WEAVER*, 2022-OHIO-4371, AND *STATE V. WHITE*, 2008-OHIO-1623. R.C. 2929.025; OHIO CONST., ARTICLE 1, SEC. 16; U.S. CONST. AMEND V, XIV.**

**{¶121}** Appellant contends the SMI trial court concluded Mosnik's testimony was inadmissible and in the alternative substituted its own judgment in place of her expert testimony. Appellant essentially argues the SMI trial court disregarded Mosnik's testimony in its entirety based on the evidence in the record establishing Appellant overstated his intellectual deficits and his mental illness in the years prior to the offense in order to acquire social security benefits.

**{¶122}** The state counters the SMI trial court did not conclude Mosnik's testimony was inadmissible under the rules of evidence (despite references to the rules and case law interpreting the rules governing admissibility), but instead, weighed Mosnik's testimony based on the other evidence in the record and discredited it in favor of Adkins' contrary conclusions.

**{¶123}** With respect to Mosnik's conclusion that Appellant satisfies both prongs of the SMI statute, the findings of fact and conclusions of law reads in relevant part:

> When said forensic records are read in light of the stunning evidence of [Appellant's] deceptive self-reports and his deliberate false symptom presentation, it is readily apparent that [Appellant's] mental health providers (doctor or psychologist) have failed to, validate the necessary criteria for a discrete categorical disorder in accord with DSM-5, including severity of

[Appellant's] specific symptoms, necessary symptom time frames, symptom salience, daily persistence of symptoms, and/or recurrence of acute episodes, if any, based upon observations of others (family members, friends, police officials) outside of their respective interviews.

Although their clinical assessments were made in "Good Faith" and in the best interest of [Appellant] at the times of his assessments, they do not constitute necessary forensic evidence upon which [Mosnik] can draw her conclusions, especially when such additional information is required to allow this Court to make legal judgments regarding [Appellant's] significantly impaired capacity to exercise rational judgment. (*See*, DSM-5, pp. 20 thru 25).

In addition, and contrary to the opinion of [Mosnik] that [Melhem] and other physicians appropriately prescribed psychotic meds, as additional pharmacological evidence of the existence of Bipolar Disorder on December 2, 2003, January 12, 2004 and February 17, [2004], the Court respectfully disagrees and defers to the considered opinions of [McPherson].

. . .

Therefore, a clinical diagnosis of a DMS-5 mental disorder, such as Bipolar and Schizoaffective Disorders, does necessarily not imply that an individual with such a condition meets the necessary legal criteria, for the presence of such disorder, or a specified legal standard for competence, criminal responsibility, or disability. It is precisely because impairments, abilities, and disabilities vary widely each category [sic] that assignment of a particular diagnosis does not imply a specific level of impairment or disability. (DSM-5, p. 25).

In accord with the above-stated findings and the necessary forensic standard to be applied, this Court finds that [Mosnik's] clinical diagnosis that

Case No. 25 NO 0525

[Appellant] was suffering from bipolar disorder and/or schizoaffective disorder prior to, or at the time of the crimes, based on her neuro-psychological profile, determined twenty years after [Appellant's] crimes, which assumes facts that are not supported by the forensic records in this case, either at the time of the alleged diagnosis, and/or at on about [sic] the time of the crimes (March 9, 2004), and which have failed to consider [Appellant's] serious credibility issues in reporting his alleged mental health symptoms throughout his entire life, [Mosnik's] clinical diagnosis does not carry a necessary implication regarding the etiology or cause of [Appellant's] mental disorder, or the individual degree of control over behaviors that may be associated with the disorder. Even when diminished control over [Appellant's] behavior is a feature of the disorder, having this diagnosis, in itself, fails to demonstrate that a particular individual is (or was) able to control his behavior at a particular time. (DSM-5, p. 25).

Therefore, in accord with the same evidentiary standard Evid. R. 702(C), which the Court applied to [Adkins], this Court finds that [Mosnik's] extrapolation of data to support her expert opinion is based on a serious analytical gap between her data and her proffered opinion (forensic records do not support the findings upon which she bases her forensic opinions.) *See*, *Valentine* [*v. Conrad*, 2006-Ohio-3561].

(FF/CL., p. 53-56.)

{¶124} "The determination of the admissibility of expert testimony is within the discretion of the trial court . . . [and] will not be disturbed absent abuse of discretion." *Valentine* at ¶ 9. The determination that an expert is qualified in an area is distinctly different from a determination that the expert's testimony is scientifically reliable under Evid.R. 702(C). *Id.* at ¶ 17. "A trial court's role in determining whether an expert's testimony is admissible under Evid.R. 702(C) focuses on whether the opinion is based upon scientifically valid principles, not whether the expert's conclusions are correct or whether the testimony satisfies the proponent's burden of proof at trial." *Miller v. Bike*

*Athletic Co.*, 80 Ohio St.3d 607 (1998), paragraph one of the syllabus. Accordingly, the trial court's focus is not on the substance of the expert's conclusion, but rather the methodology employed by the expert to reach such a conclusion. *Valentine* at ¶ 16.

**{¶125}** Here, the SMI trial court rejected Mosnik's conclusions rather than her methodology. As a consequence, we find the SMI trial court did not conclude Mosnik's testimony was inadmissible despite the SMI trial court's references to Evid. R. 702(C).

**{¶126}** In the alternative, Appellant argues the SMI trial court's reasons for discrediting Mosnik's testimony are unwarranted. A trial court " 'may not disregard credible and uncontradicted expert testimony in favor of either perceptions of lay witnesses or of the court's own expectations.' " *State v. Weaver*, 2022-Ohio-4371, ¶ 33, quoting *State v. White*, 2008-Ohio-1623, ¶ 74. A trial court " 'is not required to automatically accept' an expert's opinion, such an opinion 'may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony.' " *Weaver* at ¶ 33, quoting *White* at ¶ 71.

**{¶127}** In *White*, the Ohio Supreme Court concluded the trial court abused its discretion in determining the petitioner had failed to establish an intellectual disability when the trial court did not provide "any rational basis grounded in the evidence for rejecting the uncontradicted testimony of two qualified expert witnesses in the field of psychology." *Id.* at ¶ 70. The Supreme Court held the trial court had abused its discretion by "disregard[ing] credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations." *Id.* at ¶ 74.

**{¶128}** With respect to the SMI trial court's conclusion that Appellant failed to meet his evidentiary burden at division (A)(2), the SMI trial court did not discredit uncontradicted expert testimony. Instead, the SMI trial court credited Adkins' conclusions regarding the impact of Appellant's serious mental illness based on the additional evidence of malingering in the record and his conduct prior to and after the commission of rape. Consequently, we find there was an objectively present reason, that is, Adkins' testimony and the additional facts in the record, to discredit Mosnik's testimony.

**{¶129}** In summary, we conclude the SMI trial court did not find Mosnik's testimony was inadmissible despite references to Evid. R. 702(C) and *Valentine, supra*. We further find the SMI trial court did not arbitrarily ignore Mosnik's testimony as it related

to division (A)(2) of the SMI statute, as Adkins' testimony and additional evidence in the record constituted an objectively present reason to discredit Mosnik's testimony. Accordingly, we find Appellant's fourth and fifth assignments of error have no merit.

## ASSIGNMENT OF ERROR NO. 6

**THE TRIAL COURT ERRED IN FINDING THAT [APPELLANT'S] SECOND AND THIRD GROUNDS FOR RELIEF LACKED JURISDICTION AND WERE MOOT. OHIO CONST. ARTICLE 1, SEC. 9; U.S. CONST. AMEND VIII.**

**{¶130}** Finally, Appellant argues the SMI trial court erred in dismissing the second and third grounds for relief in his postconviction petition, which were predicated upon Appellant's argument that his death sentence constitutes cruel and unusual punishment in violation of the U.S. and Ohio Constitutions because he suffers from a serious mental illness. Appellant argues the protections of *Atkins v. Virginia*, 536 U.S. 304 (2002), which prohibit the imposition of a death sentence on a mentally-retarded defendant, should be extended to defendants with serious mental illness based on the codification of R.C. 2929.025 in 2021.

**{¶131}** The SMI trial court found it was without jurisdiction to consider Appellant's second and third grounds for relief as they constitute a successive petition. "Whether a court of common pleas possesses subject-matter jurisdiction to entertain an untimely petition for postconviction relief is a question of law, subject to de novo review." *State v. Apanovitch*, 2018-Ohio-4744, ¶ 24.

**{¶132}** Appellant did not advance a state or federal Eighth Amendment constitutional challenge to his sentence based on his mental illness in his direct appeal, but for his challenge to the weight given to the aggravating and mitigating factors resulting in his death sentence. As a consequence, the third ground for relief in his federal habeas corpus petition predicated on the alleged state and federal Eighth Amendment violations was dismissed due to lack of fair presentment.

**{¶133}** Postconviction relief is governed by R.C. 2953.21, which provides that any person who has been convicted of a criminal offense and who claims that there was such

a denial of the person's rights as to render the judgment void or voidable under either the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence. R.C. 2953.21(A)(1)(a)(i). The petition must state the grounds for relief relied upon and ask the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. R.C. 2953.21(A)(1)(a). "A petitioner shall state in the original or amended petition . . . all grounds for relief claimed by the petitioner. Except as provided in section 2953.23 of the Revised Code, any ground for relief that is not so stated in the petition is waived." R.C. 2953.21(A)(4). The petitioner "may file a supporting affidavit and other documentary evidence in support of the claim for relief." R.C. 2953.21(A)(1)(b).

{¶134} A petition for postconviction relief is a means by which the petitioner may present constitutional issues to the court that would otherwise be impossible to review because the evidence supporting those issues is not contained in the record of the petitioner's criminal conviction. "[A] postconviction proceeding is not an appeal of a criminal conviction but, rather, a collateral civil attack on the judgment." *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999). "Therefore, a petitioner receives no more rights than those granted by the statute." *Id.*

{¶135} Appellant's second and third grounds for relief constitute his third postconviction petition. In order for the trial court to exercise jurisdiction over a successive petition, the petitioner must show either he was unavoidably prevented from discovery of the facts upon which he must rely to present the claim for relief, which is inapplicable here, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right. R.C. 2953.23(A)(1)(b). Appellant argues the SMI statute creates not only a statutory right, but Ohio and federal constitutional rights as well. To the contrary, the SMI statute created a purely statutory right and Appellant has not established the United States Supreme Court has recognized a new retroactively-applied federal or state right. Consequently, we find Appellant's sixth assignment of error has no merit as the SMI trial court was without jurisdiction to consider his Eighth Amendment claims.

**CONCLUSION**

**{¶136}** In summary, we find the SMI trial court erred as a matter of law in concluding a defendant must have been forensically diagnosed with a qualifying condition to satisfy the evidentiary burden of division (A)(1) of the statute. We further find the SMI trial court abused its discretion in relying exclusively on evidence of Appellant's malingering to conclude he had not been diagnosed with a qualifying condition. Applying the correct legal standard, we find Appellant was diagnosed with Bipolar Disorder before the offense, and Bipolar Disorder and Schizoaffective Disorder after the offense.

**{¶137}** With respect to division (A)(2) of the SMI statute, we conclude the SMI trial court did not abuse its discretion when it relied on Appellant's conduct on the day of the offense and in the days that followed to conclude Appellant was capable of exercising rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct at the time of the offense. We find Appellant failed to prove by a preponderance of the evidence that he was incapable of exercising rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences or wrongfulness of his conduct due to his qualifying condition at the time of the offense. Evidence in the record of Appellant's efforts to conceal the rape and aggravated murder is susceptible to two rational albeit conflicting interpretations. Appellant's post-rape conduct either shows that his qualifying condition significantly impaired his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences, or wrongfulness of his conduct or that it did not. Because our standard of review requires deference to the trial court's interpretation of evidence susceptible to two conflicting reasonable interpretations of the facts, we affirm the SMI trial court's dismissal of the SMI petition, as Appellant has failed to prove by a preponderance of the evidence his qualifying condition significantly impaired his capacity to exercise rational judgment with respect to conforming his conduct to the requirements of the law or appreciating the nature, consequences, or wrongfulness of his conduct at the time of the offense.

**{¶138}** With respect to Appellant's arguments based on the weight given by the SMI trial court to Mosnik's testimony, we find the SMI trial court did not find her testimony

was inadmissible, nor did it substitute its own judgment where *uncontroverted* expert testimony was offered. We further find the SMI statute creates a purely statutory right and the SMI trial court did not err in finding it had no jurisdiction to consider Appellant's constitutional claims as they constituted a successive petition. Finally, we find the transcript from the competency hearing was admitted into evidence at the hearing on the SMI petition.

{¶139} Accordingly, the March 14, 2025 judgment entry is reversed as to the SMI trial court's finding under division (A)(1) of the SMI statute, however the dismissal of the SMI petition is affirmed.

Waite, P.J., concurs.

Robb, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, we reverse the judgment of the Court of Common Pleas of Noble County, Ohio, as to its finding under division (A)(1) of the SMI statute, however the dismissal of the SMI petition is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**